UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re THIRD AVENUE MANAGEMENT        :    Civil Action No. 1:16-cv-02758-PKC
LLC SECURITIES LITIGATION            :
                                     :    CLASS ACTION
———————————————————— :
                                     :
This Document Relates To:            :
                                     :
    ALL ACTIONS.                     :
                                     :    DEMAND FOR JURY TRIAL
———————————————————— x

## CONSOLIDATED AMENDED COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff IBEW Local No. 58 Sound & Communication Division Retirement Plan ("IBEW 58") and plaintiff Anthony Dallacasa (collectively, "Plaintiffs") make the following allegations, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Plaintiffs' counsel, which investigation included analysis of public filings, publicly available news articles and reports about Third Avenue Trust ("Third Avenue"), Third Avenue Management LLC ("TAM"), the Third Avenue Focused Credit Fund, and Affiliated Managers Group, Inc. ("AMG"), as well as press releases, investor communications, other public statements issued by Defendants and media reports about the Defendants.  The allegations in the Complaint are also supported by detailed analyses of the Fund (defined below) and its assets, including with the use of proprietary sources, such as Bloomberg and TRACE.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities (other than Defendants and certain others identified below) who purchased shares of the Third Avenue Focused Credit Fund (the "Focused Credit Fund" or "Fund") between March 1, 2013 and December 10, 2015 (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") (the "Class").

2.      This case centers on one of the largest implosions of a mutual fund in the history of the financial markets.  The Focused Credit Fund, a high-profile open-end mutual fund affiliated with legendary investor Martin J. Whitman ("Whitman"), portrayed itself as a "high-yield" bond fund. The Registration Statements (defined below) for the continuous offering of the Fund's shares during the Class Period, however, negligently misrepresented and omitted material information about the Fund and its assets.  Unbeknownst to investors, the Focused Credit Fund invested heavily in highly

illiquid distressed and defaulted securities. As a result, the portfolio held by the Fund violated Securities and Exchange Commission (the "SEC") rules and was not appropriate for an open-end mutual fund.

3.     Specifically, under SEC rules, no more than 15% of a fund's portfolio is permitted to be invested in illiquid securities and a fund is required to maintain a level of portfolio liquidity that is appropriate under the circumstances. The primary reason for the limit on illiquid securities is to ensure that when shareholders seek to redeem their shares for cash, the fund will have enough liquid assets to satisfy redemption requests. If a fund needs to sell illiquid securities to fulfill shareholder redemptions, there is a substantial risk that the fund would be forced to sell securities for less than their reported values, if the fund is able to sell the securities at all. Throughout the Class Period, the Focused Credit Fund misrepresented the amount of illiquid securities it held and failed to disclose that it did not maintain a level of portfolio liquidity appropriate under the circumstances. As such, the Fund was a house of cards waiting to be knocked down as soon as the Fund received large redemption requests from investors.

4.     Between the start of the Class Period and the summer of 2014, investors poured money into the Fund causing assets to increase from approximately $1 billion to $3.5 billion. The large inflow of new investments during this period masked the risks associated with the Fund's illiquid investments. Beginning in the summer of 2014, as new investments slowed and redemptions increased, the Fund was forced to use its cash and liquidate securities to honor redemptions. This resulted in the Fund becoming even more concentrated in illiquid securities. During 2015, as redemptions significantly exceeded new purchases, so did the pressure on the Fund to liquidate securities to meet redemptions. Since the Fund was not sufficiently liquid to meet redemptions, it was forced to sell illiquid securities well below their stated values. This caused the Fund's share

- 2 -

price to decline, which resulted in even more redemptions, more selling of illiquid securities, and more declines in the Fund's share price.[1]  By early December 2015, the Fund's shares were down 27% for the year.

5.      Then, on December 10, 2015, the Fund shocked the investment community by unilaterally suspending redemptions of the Fund and publicly acknowledging that due to the level of the Fund's illiquid securities, shareholder redemptions were negatively impacting the Fund's NAV. In other words, the house of cards was collapsing and the Fund halted suspensions in order to save the remaining few cards standing on the bottom row.  By that time, the Fund's shares closed at more than 45% below their Class Period highs.  The Fund, however, was not permitted to simply halt redemptions without permission from the SEC, which outraged investors and investment professionals alike.  Days later, on December 16, 2015, the Fund obtained from the SEC the nearly unprecedented permission to suspend redemptions.

6.      The Fund is currently in the process of attempting to liquidate its securities over time so that it can make distributions to shareholders.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].  In connection with the acts complained of, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act [15 U.S.C. §77v].

---

[1]      The Fund's share price is also referred to herein as the net asset value (the "NAV").

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b).   Defendants Third Avenue, TAM, and MJW (defined below) maintain their headquarters in this District.   Many of the acts that are the subject of this action took place in this District.   This action was transferred to this Court from the United States District Court for the Central District of California as a result of a motion to transfer filed by certain Defendants.

## THE PARTIES

**Plaintiffs**

10.      Lead Plaintiff IBEW 58 acquired shares of the Focused Credit Fund, pursuant and traceable to several Registration Statements, including Prospectuses (defined below), accompanying the issuance of the Focused Credit Fund as set forth in its certification that was previously filed in this case and is incorporated herein by reference, and has been damaged thereby.

11.      Plaintiff Anthony Dallacasa acquired shares of the Focused Credit Fund, pursuant and traceable to several Registration Statements, including Prospectuses, accompanying the issuance of the Focused Credit Fund as set forth in his certification attached hereto, and has been damaged thereby.

**Corporate Defendants**

12.      Defendant Third Avenue is an open-end investment company (also known as an open-end mutual fund) with several series of investment funds, including the Focused Credit Fund. Third Avenue is organized under the laws of Delaware pursuant to a Trust Instrument dated October 31, 1996.   Third Avenue is headquartered at 622 Third Avenue, New York, New York 10017.   Unless otherwise indicated, defendants Third Avenue and the Focused Credit Fund will be referred to collectively herein as the "Focused Credit Fund" or the "Fund."

13.      Defendant TAM is a global asset manager and investment advisor that focuses on delivering investment strategies and integrated solutions to private and institutional clients, including

- 4 -

defendant Third Avenue.  TAM is headquartered at 622 Third Avenue, New York, New York 10017.
As a registered investment adviser under the ICA (defined below), TAM carries out its duties,
subject to the policies established by the Fund's Board of Trustees (the "Board of Trustees" or the
"Board"), under the Investment Advisory Agreement.  The Fund compensated TAM under the
Investment Advisory Agreement which provided for an annual advisory fee based on the total
average daily NAV for the Fund.  The fee of .75% was calculated daily and paid monthly.  The
annual fee paid to TAM was as high as $21 million in 2014.

14.     Defendant AMG, a Delaware corporation, is an asset management holding company
which owns equity interests in various investment management firms.  AMG owns more than 50%
of the equity of TAM and has the power to control TAM.  AMG is headquartered at 600 Hale Street,
Beverly, Massachusetts 01915.

15.     Defendant M.J. Whitman LLC ("MJW"), TAM's affiliated broker-dealer, was,
throughout the Class Period, the principal underwriter and distributor for shares of the Fund.  MJW
also served as Third Avenue's agent for the purpose of the continuous public offering of the Fund's
shares.  TAM and the MJW shared an office and several executive officers of TAM were executive
officers of MJW during the Class Period.  MJW is headquartered at 622 Third Avenue, New York,
New York 10017.  As the distributor of the Fund's shares, MJW received a distribution fee from the
Fund.  The fee was calculated at the annual rate of .25% of the Fund's average daily NAV.  The
distribution fee paid to MJW was as high as $2.95 million in 2014.

**Individual Defendants**

16.     Defendant Whitman was at all relevant times the Chairman of the Board of Trustees.
Whitman signed the Registration Statements and Prospectuses effective March 1, 2013, March 15,
2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

17.     Defendant David M. Barse ("Barse") was at all relevant times Chief Executive Officer ("CEO"), President and a Trustee of Third Avenue until he was fired in December 2015. Barse signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

18.     Defendant Vincent J. Dugan ("Dugan") was at all relevant times Chief Financial Officer ("CFO") of Third Avenue.  Dugan signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

19.     Defendant William E. Chapman, II ("Chapman") was at all relevant times a Trustee of Third Avenue.  Chapman signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

20.     Defendant Lucinda Franks ("Franks") was at all relevant times a Trustee of Third Avenue.  Franks signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

21.     Defendant Edward J. Kaier ("Kaier") was at all relevant times a Trustee of Third Avenue.  Kaier signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

22.     Defendant Eric Rakowski ("Rakowski") was at all relevant times a Trustee of Third Avenue.  Rakowski signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

23.     Defendant Martin Shubik ("Shubik") was at all relevant times a Trustee of Third Avenue.  Shubik signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

24.     Defendant Charles C. Walden ("Walden") was at all relevant times a Trustee of Third Avenue.  Walden signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014, March 13, 2014, February 27, 2015 and March 18, 2015.

25.     Defendant Patrick Reinkemeyer ("Reinkemeyer") has served since January 2015 and at all relevant times thereafter as a Trustee of Third Avenue.  Reinkemeyer signed the Registration Statement and Prospectus filed on February 27, 2015 and March 18, 2015.

26.     Defendant Jack W. Aber ("Aber") was a Trustee of the Trust.  Aber signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014 and March 13, 2014.

27.     Defendant Marvin Moser ("Moser") was a Trustee of the Fund.  Moser signed the Registration Statements and Prospectuses effective March 1, 2013, March 15, 2013, February 28, 2014 and March 13, 2014.

28.     Defendants Whitman, Barse, Dugan, Chapman, Franks, Kaier, Rakowski, Shubik, Walden, Reinkemeyer, Aber, and Moser (collectively, the "Individual Defendants") prepared, reviewed and/or signed or authorized the signing of some or all of the Registration Statements for the offerings of shares of the Fund at times relevant herein.  Additionally, each of the Individual Defendants were, at one point during the Class Period, members of the Board of Trustees.  The Board of Trustees was responsible for overseeing generally the management, activities and affairs of the Fund.  The Board of Trustees also established Valuation and Fair Value Committees.  The Valuation Committee was composed of the Fund's CFO, controller and general counsel.  The Fair Value Committee was composed of all independent Trustees of the Fund.  These Committees assisted the Board of Trustees in establishing valuation policies, in providing direction to TAM

regarding the principles of valuing certain securities or types of securities, and in reviewing valuations determined by TAM.

29.     Throughout the Class Period, the Fund paid each independent Trustee an annual retainer of $65,000 for their services to the Fund.  Independent Trustees received an additional $5,000 for each meeting of the Fund that he or she attended.  If a special Board meeting was required, the independent Trustee would receive an additional fee of $2,500.  The lead independent Trustee received a supplemental annual retainer of $12,000.  Defendants deemed independent Trustees throughout the Class Period included defendants Chapman (the lead independent Trustee), Franks, Kaier, Rakowski, Reinkemeyer, Shubik, Walden, Moser and Aber.  Defendants Whitman and Barse were interested Trustees due to the compensation they received as a result of their employment with, and ownership interest in, TAM and MJW.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are Defendants, the officers and directors of the Defendant companies, at all relevant times, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, heirs, successors or assigns and any such excluded party.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants, or specifically by the Fund or its transfer

agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the other members of the Class.

33.     Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class and have retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statements negligently omitted and/or misrepresented material facts about the Fund;

(c)     whether the Registration Statements contained untrue statements of material fact; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Focused Credit Fund and Relevant SEC Filings

36.     When the Fund began offering shares to investors, it represented that it sought to achieve an investment objective of long-term capital return, mainly by investing in bonds and other types of credit instruments and planned to invest a substantial amount of its assets in credit instruments rated below investment grade.  The Fund was categorized as a "high-yield" fund by mutual fund rating services Morningstar, Inc. ("Morningstar") and Lipper, Inc. ("Lipper").

37.     The Fund issued two classes of shares, both sharing the same underlying portfolio of assets.  The "classes differ[ed] to the extent they b[ore] certain class specific minimums and expenses."  Specifically, the Investor Class shares carried a minimum initial investment of $2,500 and ticker of "TFCVX," and Institutional Class shares, a minimum initial investment of $100,000 and ticker of "TFCIX."  Additionally, fees associated with the Institutional Class shares were lower than fees on the Investor Class shares.

38.     Because the minimums and fees were the main differentiating factors between the two classes, Investor Class shares and Institutional Class shares were convertible into each other if certain criteria was met.  If the current market value of an account in the Investor Class was at least $100,000, an investor could elect to convert that account to Institutional Class shares on the basis of relative NAVs.  Similarly, if the current market value of an investor's Institutional Class shares account declined to less than $100,000, the Fund could convert that account into Investor Class shares on the basis of relative NAVs.

39.     Defendants annually filed substantially similar registration statements and prospectuses throughout the Class Period in connection with the continuous offerings of both Focus

Credit Fund share classes.  The Fund's shares were issued to investors pursuant to a series of registration statements and prospectuses that formed part of the registration statements filed with the SEC and made effective during the Class Period, which are referred to collectively herein as the "Registration Statements," include the following:

(a)     Registration Statement and Prospectus, effective March 1, 2013;

(b)     Registration Statement, effective March 15, 2013;

(c)     Registration Statement and Prospectus, effective February 28, 2014;

(d)     Registration Statement, effective March 13, 2014;

(e)     Registration Statement and Prospectus, effective February 27, 2015; and

(f)     Registration Statement, effective March 18, 2015.

40.     Defendants also filed Summary Prospectuses, Summary Prospectus Supplements, Prospectus Supplements and Certifications of No Change in the Definitive Materials, throughout the Class Period in connection with the continuous offerings of the Fund's shares.  These filings formed part of the Registration Statements filed with the SEC and were made effective during the Class Period:

(a)     Summary Prospectus, filed on February 28, 2013;

(b)     Certification of No Change in the Definitive Material, filed on March 5, 2013;

(c)     Prospectus Supplement, filed on April 24, 2013;

(d)     Summary Prospectus, filed on February 28, 2014;

(e)     Certification of No Change in the Definitive Material, filed on March 13, 2014;

(f)     Prospectus Supplement, filed on June 11, 2014;

(g)     Prospectus Supplement, filed on September 5, 2014;

    (h)     Summary Prospectus Supplement, filed on September 5, 2014;

    (i)     Summary Prospectus, filed on February 27, 2015;

    (j)     Prospectus Supplement, filed on March 23, 2015;

    (k)     Summary Prospectus, filed on March 23, 2015; and

    (l)     Prospectus Supplement, filed on October 15, 2015.

41.    Statements of additional information ("SAI"), SAI Supplements, Quarterly, Semi-Annual and Annual Reports for the Fund, which provided investors with additional information about, *inter alia*, the Fund's investment strategies and limitations, were also filed throughout the Class Period.  The Registration Statements referred investors seeking more information about the Fund to the SAIs, which were incorporated by reference and "legally considered part of" the Registration Statements.  In turn, the Funds' Annual Reports to Shareholders were incorporated by reference in the SAIs and "legally considered part of th[e] SAI[s]."  The Registration Statements also directed investors to review, for more information about the Fund and their accounts, the Fund's Quarterly and Semi-Annual Reports.

42.    These filings, which were referenced and/or incorporated by reference in the Registration Statements, formed part of the Registration Statements filed with the SEC, and include the following:

    (a)     SAI, dated March 1, 2013;

    (b)     First Quarter Report for 2013, filed on March 7, 2013;

    (c)     Semi-Annual Report for 2013, filed on June 25, 2013;

    (d)     Third Quarter Report for 2013, filed on September 19, 2013;

    (e)     Annual Report for 2013, filed on December 30, 2013;

    (f)     SAI, dated February 28, 2014;

(g)    First Quarter Report for 2014, filed on March 12, 2014;

(h)    SAI, filed on June 11, 2014;

(i)    Semi-Annual Report for 2014, filed on June 20, 2014;

(j)    SAI Supplement, filed on September 5, 2014;

(k)    Third Quarter Report for 2014, filed on September 16, 2014;

(l)    Annual Report for 2014, filed on January 6, 2015;

(m)    SAI, dated March 1, 2015;

(n)    SAI, filed on March 2, 2015;

(o)    First Quarter Report for 2015, filed on March 16, 2015;

(p)    SAI, filed on March 23, 2015;

(q)    Semi-Annual Report for 2015, filed on June 26, 2015;

(r)    Third Quarter Report for 2015, filed on September 25, 2015; and

(s)    SAI, filed on October 15, 2015.

43.    Each member of the Class purchased shares of the Fund pursuant to the Registration Statements.

### The Fund Was Required to Maintain Adequate Liquidity to Meet Customer Redemption Requests

44.    An open-end mutual fund, such as the Focused Credit Fund, provides investors with a safe, easy, low-cost way to pool their money with other investors to benefit from professional investment management, diversification, and liquidity.  People buy shares in open-end funds for different reasons, such as investing for retirement and their children's college education.  Institutions also invest in open-end funds as part of their investment strategy.  As long as an open-end mutual fund is accepting new investments, the fund will issue an unlimited number of shares to investors.

45.     Shares of open-end mutual funds are bought and sold at the NAV of the fund, which is based on the value of the fund's underlying assets and is calculated at the end of each trading day. A cornerstone of an open-end mutual fund is the liquidity of its portfolio since investors buy shares with the expectation that they can redeem their shares and receive their funds within days. Open-end funds typically redeem investors' shares within one business day. Unlike common stocks and closed-end funds, the prices of shares of open-end funds are not supposed to be impacted by ordinary market forces of supply and demand of the fund's shares because purchases and sales of shares are made directly with a fund instead of with other investors.[2] Rather, in basic terms, the NAV of a fund is based on the value of a fund's assets minus liabilities divided by the number of outstanding shares (NAV = (assets – liabilities) / shares outstanding).[3]

46.     To that end, the SEC has expressed that "[d]aily redeemability is a defining feature of open-end management investment companies" such as mutual funds. *Open-End Fund Liquidity Risk Management Programs*, SEC Release Nos. 33-9922; IC-31835, 2015 SEC LEXIS 3879 (Sept. 22, 2015) ("SEC Release No. 33-9922"). By law, investors must receive their *pro rata* share of the fund's net assets with seven days after delivery of a redemption notice. Pursuant to Section 22(e) of the Investment Company Act of 1940 (the "ICA"), absent unusual circumstances, "[n]o [open-end fund] shall suspend the right of redemption, or postpone the date of payment or satisfaction upon redemption of any redeemable security in accordance with its terms for more than seven days after tender of [the] security." Furthermore, pursuant to Rule 15c6-1 of the Securities Exchange Act of

---

[2]     *See, e.g.*, Morningstar.com, *Navigating NAV*, June 3, 2015, *available at* http://investors.morningstar.com/news/cmsAcontent.html?t=VEXPX&resourceId=699825&src=  Morningstar&date=06-03-2015& nav=no&region=USA&culture=en-US&ProductCode=mle (last visited July 12, 2016).

[3]     *See, e.g.*, 20 Something Finance, *How is a Mutual Fund's Share Price (NAV) Determined*, December 30, 2013, *available at* http://20somethingfinance.com/how-is-a-mutual-funds-share-price-nav-determined/ (last visited July 11, 2016).

1934, open-end funds that are redeemed through broker-dealers must meet redemption requests within three business days. According to the SEC, "[a] hallmark of open-end funds is that they must be able to convert some portion of their portfolio holdings into cash on a frequent basis because they issue redeemable securities." SEC Release No. 33-9922 at 5. On its website, the SEC lists the ability of investors to readily redeem their shares as one of the "traditional, distinguishing characteristics of mutual funds."[4]

47.    Since open-end funds are required to fulfill redemption requests quickly, the liquidity of a fund's portfolio is a crucial aspect of the management of the fund. The SEC's website identifies liquidity as one of the key "advantages" of open-end funds. According to the Investment Company Institute ("ICI"), a leading global association of regulated funds, including mutual funds, exchange-traded funds (ETFs), closed-end funds, and unit investment trusts (UITs) in the United States and similar funds offered to investors worldwide, "liquidity management is not only a regulatory compliance matter, but also a major element of investment risk management, an intrinsic part of portfolio management, and a constant area of focus for fund managers." *Comment Letter of the Asset Management Group of SIFMA and the Investment Adviser Association on the FSOC Notice*, Docket No. FSCO-2014-0001 (Mar. 25, 2015).

48.    If a fund does not have an appropriate level of liquidity, shareholder redemptions could force the fund to sell assets at below reported prices, which would negatively impact the fund's NAV and reduce the value of the shares held by non-selling shareholders. As alleged herein, that is what occurred with the Focused Credit Fund.

49.    As an SEC registered open-end investment company under the ICA, Third Avenue, and its series of investment funds, including the Focused Credit Fund, is subject to the rules and

---

[4]   *See* U.S. Securities and Exchange Commission, *Invest Wisely: An Introduction to Mutual Funds*, http://www.sec.gov/investor/pubs/inwsmf.htm#key (last visited July 11, 2016).

regulations governing mutual funds under the ICA.  Under SEC guidelines, in order to ensure a

mutual fund will be able to timely satisfy investor redemption requests, at least 85% of its assets

must be "liquid."  *See Revisions of Guidelines to Form N-1A*, SEC Release No. 33-6927; IC-18612,

1992 SEC LEXIS 1083 (Mar. 12, 1992) ("SEC Release No. 33-6927").  A security is defined as

"illiquid" if it cannot be sold or disposed of in the ordinary course of business within seven days at

approximately the value at which the fund has valued the investment in its books.  *See Acquisition*

*and Valuation of Certain Portfolio Instruments by Registered Investment Companies*, SEC Release

No. IC-14983, 1986 SEC LEXIS 2317 (Mar. 21, 1986) ("SEC Release No. IC-14983").

> 50.     In adopting its 15% guideline, the SEC explained as follows:

> To compute an accurate net asset value per share, a mutual fund must be able to
> value each portfolio security accurately.  Mutual funds must use market price to
> value securities for which market quotations are readily available; the board of
> directors must make a good faith determination of the fair value of securities for
> which market prices are not readily available.  If the net asset value of a mutual fund
> is not accurate, purchasing or redeeming shareholders may pay or receive too little or
> too much for their shares, and the interests of remaining shareholders may be
> overvalued or diluted.

> To meet these requirements, a mutual fund must maintain a high degree of portfolio
> liquidity.

*Revisions of Guidelines to Form N-1A*, 1992 SEC LEXIS 1083, Rel. No. 33-6927; 1C-18612

(Mar. 12, 1992).

> 51.     Aside from the minimum 15% illiquid threshold, a fund is also required to maintain a

level of portfolio liquidity that is "appropriate under the circumstances."  In fact, the SEC made clear

that its adoption of the 15% guideline did not "relieve a fund from the requirements concerning

valuation and the general responsibility to maintain a level of portfolio liquidity that is appropriate

under the circumstances."  *Id.*  The SEC stated, in pertinent part, as follows:

> If no market quotations for an illiquid security are available, the board of directors of
> the fund will be required to determine the fair value of the security.  ***In addition, the***
> ***Commission expects funds to monitor portfolio liquidity on an ongoing basis to***

> **determine whether, in light of current circumstances, an adequate level of liquidity is being maintained. For example, an equity fund that begins to experience a net outflow of assets because investors increasingly shift their money from equity to income funds should consider reducing its holdings of illiquid securities in an orderly fashion in order to maintain adequate liquidity.**

*Id.* (Emphasis added unless otherwise indicated herein).

52.    According to the SEC, "[g]iven the statutory and regulatory requirements for meeting redemption requests, as well as any disclosure made to investors regarding payment of redemption proceeds, a mutual fund must adequately manage the liquidity of its portfolio so that redemption requests can be satisfied in a timely manner." SEC Release No. 33-9922, at 9.

53.    As SEC Commissioner Kara M. Stein pointed out in a speech, sufficient portfolio liquidity and the ability to meet redemptions are two interconnected bedrock principles that support a mutual fund:

> **A retail investor looks at a mutual fund and expects that he or she will be able to get money out of a fund very quickly if needed.** A retail investor is generally not performing cash flow analyses on mutual funds to test their true liquidity.
>
> This expectation comes from the Investment Company Act of 1940, which requires mutual funds to honor redemption requests within seven days of a shareholder request. In practice, as many of you have probably experienced, the redemption occurs much more quickly than that. In addition, Commission guidance only allows mutual funds to invest up to 15% of the fund's assets in illiquid securities. **As a result of both of these requirements, retail investors assume that their investments in registered funds are fairly liquid and can be redeemed quickly if need be. This liquidity profile has been a foundational principle of the Investment Company Act since its inception.**[5]

54.    The Focused Credit Fund's Registration Statements, in addition to advising purchasers that the Fund would limit illiquid investments to 15%, represented that it would limit "up to 15% of its total net assets in securities which are not readily marketable."

---

[5]    *See* Commissioner Kara M. Stein, *Mutual Funds – The Next 75 Years*, June 15, 2015, *available at* https://www.sec.gov/news/speech/mutual-funds-the-next-75-years-stein.html (last visited July 11, 2016).

**The Focused Credit Fund Was Not Sufficiently Liquid**

55.      Throughout the Class Period, the Registration Statements stated that the Fund's portfolio was sufficiently liquid to meet customer redemptions on a daily basis, and in no event, longer than within seven days.  In turn, the Registration Statements stated that less than 15% of the Fund's securities were illiquid or not readily marketable.  Additionally, the Registration Statements stated that the liquidity of the portfolio was closely monitored.

56.      Contrary to these representations, however, the Fund was not sufficiently liquid. First, more than 15% of the Fund's securities were illiquid throughout the Class Period.  Second, the Fund did not maintain a level of portfolio liquidity that was appropriate under the circumstances. Third, since the Fund did not maintain sufficient liquidity, investors were exposed to an undisclosed substantial risk that if share purchases decrease, or if the Fund experiences more outflows than inflows, the Fund would be forced to sell illiquid assets for less than their reported prices, causing a decline in the Fund's NAV.  Finally, investors were exposed to an undisclosed risk that they would be unable to redeem their shares within the one day represented by the Fund, or even the seven days required by law, due to liquidity issues.

57.      On December 10, 2015, the undisclosed redemption risk materialized when the Fund suspended all redemptions by shareholders.  The liquidity issues that caused the suspension were not a sudden event.  Rather, liquidity problems plagued the Fund since at least the beginning of the Class Period.  As demonstrated by several analyses of the Fund's portfolio, from several different perspectives, throughout the Class Period, more than 15% of the Fund's portfolio was illiquid, and the Fund did not maintain sufficient liquidity under the circumstances to protect shareholders' right of redemption.

### The Composition of the Fund's Portfolio
### Reveals that It Was Not Sufficiently Liquid

58.     After the Fund suspended all redemptions, BlackRock, Inc. ("Blackrock"), the largest investment manager in the world, performed an in-depth analysis of the Focused Credit Fund's portfolio (as of July 31, 2015) to determine why the Fund experienced such problems and whether other funds were also at risk.  The Blackrock analysis, which can be properly characterized as an autopsy of the Focused Credit Fund, concluded that the Focused Credit Fund was not sufficiently liquid during the Class Period.  After it completed its analysis, on January 20, 2016, Blackrock provided to the SEC its findings in a report entitled *High Yield Case Study: Post Closing of Third Avenue Focused Credit Fund* (the "Blackrock Report").

59.     The Blackrock Report discusses, in detail, the liquidity and redemption problems experienced by the Fund and compares the Focused Credit Fund's portfolio to that of other open-end mutual funds.  The Blackrock Report identified several characteristics of the Focus Credit Fund's portfolio which raised concerns that the Fund "held a significant percent of the portfolio in less liquid or hard to sell assets."  The Blackrock Report concluded that the portfolio characteristics of the Focused Credit Fund, "combined with the daily liquidity of a 1940 Act Fund resulted in a fund portfolio with liquidity issues."

60.     The Blackrock Report noted that nearly 90% of the Fund's assets were rated Below B or not rated (NR) compared to the Barclays U.S. High-Yield 2% Issuer Capped Index (the "Benchmark") which had only 14% in Below B assets.  Additionally, the Focus Credit Fund held over 41% of the portfolio in not rated securities, compared to less than 5% for each of the two high-yield funds examined by Blackrock.  According to Blackrock, "[a]ssets that are 'not rated' are often less liquid than rated securities."

- 19 -

61.     According to the Blackrock Report, the Focused Credit Fund's focus on assets with significantly higher coupon rates, further explains its liquidity issues.  As of July 31, 2015, the Focused Credit Fund invested more than 50% of its assets in securities with coupons of 10% or higher, compared with only 3% by the average high-yield fund (per Morningstar) and 4% in the Benchmark.

62.     Liquidity issues were further identified when the Focused Credit Fund's portfolio was analyzed under a liquidity tier approach.  This analysis, which is a very common method of analyzing liquidity by the investment community, categorizes a fund's assets by how readily they can be sold, with Tier 1 being the most liquid assets and Tier 5 being the least liquid assets:

- *Tier 1*: Cash and securities that can be readily converted to cash in normal and stressed markets at close to the existing market price.

- *Tier 2*: Securities that can be readily transacted in normal market environments and remain readily transactable (at wider bid-ask spreads than Tier 1), even during stressed markets.

- *Tier 3:* Securities that can be transacted (at wider bid-ask spreads than Tier 2) in normal market environments, ***but can become somewhat more difficult to transact with immediacy*** (or are transactable at wider bid-ask spreads than Tier 2) in stressed markets.

- *Tier 4*: Securities that can be transacted (at wider bid-ask spreads than Tier 3) in normal market environments, but, due to a smaller investor base or other reasons, ***may become more difficult to transact with immediacy*** (if at all or are transactable at much wider bid-ask spreads than Tier 3) in stressed markets.

- *Tier 5*: Securities that ***require heavy negotiations*** to trade in normal and stressed markets.[6]

63.     Under this approach, the Blackrock Report found that nearly ***25% of the Fund's assets were Tier 5 assets*** (securities that require heavy negotiations to trade in normal and stressed

---

[6]     *See Blackrock Memorandum*, January 13, 2016, *available at* https://www.sec.gov/comments/ s7-16-15/s71615-89.pdf (last visited July 12, 2014) (summarizing topics discussed with the SEC staff, including Commissioner Stein, in a meeting on mutual funds).

markets). This is in stark contrast to the high-yield funds reviewed in the report which each held *less than 2% Tier 5 assets*.

64.     The Blackrock Report also found that the Focused Credit Fund's degree of concentration of portfolio holdings indicates liquidity constraints. Blackrock determined that the top ten holdings of the Focused Credit Fund comprised 28.4% of total assets compared to 9.7% and 6.8% for funds with predominantly high-yield assets.

65.     Additionally, the Blackrock Report found that a large amount of Level 3 assets held by the Focused Credit Fund contributed to the portfolio's illiquidity. Level 3 assets are the lowest assets on the fair value hierarchy. The hierarchy assists managers in categorizing assets by the amount of information available to them: *Level 1* assets are based on unadjusted quoted prices in active markets for identical assets or liabilities; *Level 2* assets are based on "significant judgment by the Fund[]" because "[i]nputs other than [observable] quoted prices," are used including in non-active markets; and *Level 3* assets are the most opaque, because they rely on "[s]ignificant unobservable inputs," not derived from the market. Blackrock opined that while not all Level 3 assets are illiquid, "a high percentage of Level 3 assets in a portfolio can be an indicator of liquidity constrained holdings." The Blackrock Report found that the "differences in the percentage of Level 3 holdings" of the Focused Credit Fund versus the other two funds Blackrock evaluated "is quite stark." The Focused Credit Fund held almost 20% in Level 3 assets compared with the other funds which held 0.02% and 3.8% Level 3 assets.

66.     The characteristics of the Focus Credit Fund's portfolio, which were found by Blackrock to be indicative of the Fund's severe liquidity problems, existed throughout the entire Class Period. Indeed, as stated in the Blackrock Report, "*Third Avenue's need to shut [the Focused Credit Fund] did not happen 'suddenly*.'"

67.     In addition to Blackrock, other financial experts and analysts commented about the illiquidity of the Fund.  A December 14, 2015 *Wall Street Journal* article stated the Fund "was significantly more aggressive than other junk bond mutual funds.  More than half the bonds it held paid annual coupons of over 10%, while the average high-yield fund had less than 5% of its assets in that category."  The Fund also reportedly "scooped up large amounts of distressed debt and unrated securities, [becoming] the largest holder of certain loans and securities that traded infrequently, according to a person familiar with the matter."  It was reported that one investment firm purchased the Fund's private equity position in Longview Power LLC, a power plant in West Virginia, ***at a more-than-40% discount*** to the price at which the asset was quoted, showing that the asset was not liquid at the Fund's reported value.

### The Trading Activity of the Fund's Securities Indicate that More than 15% Was Illiquid Throughout the Class Period

68.     A security is illiquid if it cannot be sold in the ordinary course of business within seven days at approximately the price at which it is valued by a fund.  Whether a security can be sold within seven days at a particular price is impacted by how active a market is for that security.  If a security trades frequently and in large volumes, such as a common stock which trades on the New York Stock Exchange, it is generally considered liquid.  On the other hand, the lack of an active market for a security is an indication that a security is less liquid because it will be harder to sell within the requisite time period.  As stated in *Accounting Research Manager,* a comprehensive financial reporting knowledgebase, in *Interpretations of Topic 820, Fair Value Measurement,* "[w]hen the market is inactive, it is more difficult to find a market participant that would purchase the security, making the financial instrument illiquid" and a "significant decrease in the volume or level of activity for that asset or liability when compared to normal volumes or levels of activity may affect the fair value of an asset or a liability."

69.    Plaintiffs analyzed the liquidity of the Focus Credit Fund's securities by determining how active the markets were for those securities.  Utilizing the TRACE system – a proprietary historical bond trading database – Plaintiffs analyzed the trading activity of the securities in the Fund's portfolio as of April 30, 2013, April 30, 2014, and April 30, 2015.

70.    Since the SEC's definition of illiquidity is based on whether a security can be sold within seven days, Plaintiffs reviewed the actual trading patterns of each Fund security to determine whether any units of those securities were traded seven days before or seven days after the reported holding date (the "Trailing 7-day Liquidity Analysis" and "Forward 7-day Liquidity Analysis").  For purposes of the 7-day Liquidity Analyses, if a single unit of a security was traded even once during that time period, it was considered liquid.  If a security did not trade at all during that time period, it was considered illiquid.  Plaintiffs also performed the same analysis for a 30-day period under which it was determined whether the securities traded 30-days before or 30-days after the reported holding date (the "Trailing 30-day Liquidity Analysis" and "Forward 30-day Liquidity Analysis").

71.    The results of the Trailing 7-day Liquidity Analysis and 30-day Liquidity Analysis show that as of April 30, 2013, between 44.9% and 46.1% of the Fund's portfolio was illiquid, as of April 30, 2014, between 46.8% and 48.7% of the Fund's portfolio was illiquid, and as of April 30, 2015, between 18.0% and 25.4% of the Fund's portfolio was illiquid.  The tables below reflect the results of the Trailing and Forward 7-day and 30-day analyses as of April 30, 2013, April 30, 2014, and April 30, 2015:

| Liquidity Test on April 30, 2013 | | | | | |
|---|---|---|---|---|---|
| **Table 1a: Trailling 7-Day Liquidity, 4/30/2013** | | | **Table 1c: Trailling 30-Day Liquidity, 4/30/2013** | | |
| Total Market Value of Illiquid Securities ($) | 553,322,771 | | Total Market Value of Illiquid Securities ($) | | 528,787,315 |
| Total Net Assets ($) | 1,201,135,622 | | Total Net Assets ($) | | 1,201,135,622 |
| Percentage of Illiquid Securities (%) | 46.1% | | Percentage of Illiquid Securities (%) | | 44.0% |
| | | | | | |
| **Table 1b: Forward 7-Day Liquidity, 4/30/2013** | | | **Table 1d: Forward 30-Day Liquidity, 4/30/2013** | | |
| Total Market Value of Illiquid Securities ($) | 549,724,049 | | Total Market Value of Illiquid Securities ($) | | 538,763,726 |
| Total Net Assets ($) | 1,201,135,622 | | Total Net Assets ($) | | 1,201,135,622 |
| Percentage of Illiquid Securities (%) | 45.8% | | Percentage of Illiquid Securities (%) | | 44.9% |

Source: Bloomberg , TRACE, Form N-CSRS Semi-Annual Report (April 30, 2013)
Note:
1. Trailing N-Day liqudity tests whether a security was traded during the last N days on or before the stated date. Forward N-Day liquidity tests whether a security was traded within N days after the stated date.
2. Market values of individual securities and total net assets data are from Form N-CSRS Semi-Annual Report (April 30, 2013).
3. Trading history is obtained from Bloomberg and TRACE.

| Liquidity Test on April 30, 2014 | | | | | |
|---|---|---|---|---|---|
| **Table 2a: Trailling 7-Day Liquidity, 4/30/2014** | | | **Table 2c: Trailling 30-Day Liquidity, 4/30/2014** | | |
| Total Market Value of Illiquid Securities ($) | 1,460,355,988 | | Total Market Value of Illiquid Securities ($) | | 1,434,752,801 |
| Total Net Assets ($) | 3,062,504,085 | | Total Net Assets ($) | | 3,062,504,085 |
| Percentage of Illiquid Securities (%) | 47.7% | | Percentage of Illiquid Securities (%) | | 46.8% |
| | | | | | |
| **Table 2b: Forward 7-Day Liquidity, 4/30/2014** | | | **Table 2d: Forward 30-Day Liquidity, 4/30/2014** | | |
| Total Market Value of Illiquid Securities ($) | 1,491,408,452 | | Total Market Value of Illiquid Securities ($) | | 1,460,355,988 |
| Total Net Assets ($) | 3,062,504,085 | | Total Net Assets ($) | | 3,062,504,085 |
| Percentage of Illiquid Securities (%) | 48.7% | | Percentage of Illiquid Securities (%) | | 47.7% |

Source: Bloomberg , TRACE, Form N-CSRS Semi-Annual Report (April 30, 2014)
Note:
1. Trailing N-Day liqudity tests whether a security was traded during the last N days on or before the stated date. Forward N-Day liquidity tests whether a security was traded within N days after the stated date.
2. Market values of individual securities and total net assets data are from Form N-CSRS Semi-Annual Report (April 30, 2014).
3. Trading history is obtained from Bloomberg and TRACE.

| Liquidity Test on April 30, 2015 | | | | | |
|---|---|---|---|---|---|
| **Table 3a: Trailling 7-Day Liquidity, 4/30/2015** | | | **Table 3c: Trailling 30-Day Liquidity, 4/30/2015** | | |
| Total Market Value of Illiquid Securities ($) | 598,021,115 | | Total Market Value of Illiquid Securities ($) | | 448,465,368 |
| Total Net Assets ($) | 2,462,986,227 | | Total Net Assets ($) | | 2,462,986,227 |
| Percentage of Illiquid Securities (%) | 24.3% | | Percentage of Illiquid Securities (%) | | 18.2% |
| | | | | | |
| **Table 3b: Forward 7-Day Liquidity, 4/30/2015** | | | **Table 3d: Forward 30-Day Liquidity, 4/30/2015** | | |
| Total Market Value of Illiquid Securities ($) | 625,255,315 | | Total Market Value of Illiquid Securities ($) | | 443,380,508 |
| Total Net Assets ($) | 2,462,986,227 | | Total Net Assets ($) | | 2,462,986,227 |
| Percentage of Illiquid Securities (%) | 25.4% | | Percentage of Illiquid Securities (%) | | 18.0% |

Source: Bloomberg , TRACE, Form N-CSRS Semi-Annual Report (April 30, 2015)
Note:
1. Trailing N-Day liqudity tests whether a security was traded during the last N days on or before the stated date. Forward N-Day liquidity tests whether a security was traded within N days after the stated date.
2. Market values of individual securities and total net assets data are from Form N-CSRS Semi-Annual Report (April 30, 2015).
3. Trading history is obtained from Bloomberg and TRACE.

72. As demonstrated by the analysis above, unbeknownst to shareholders, limited markets existed for the sale of a substantial portion of the Fund's assets.[7] Indeed, an article in the New York Times Deal Book, entitled *A New Focus on Liquidity After a Fund's Collapse*, described the Fund's portfolio as skewed "toward high-risk, high-return turnaround situations in which the bonds traded so infrequently that determining a price for them was little more than guesswork."

## An Analysis of the Fund's Holdings Reveals that
## More than 15% of the Fund's Securities Were Illiquid

73. The question of whether a security is considered liquid often depends on the type of security in question. The Registration Statements, however, informed investors that securities which are typically illiquid may actually be liquid if they satisfy certain undisclosed standards developed by the Fund. In other words, the Board decided whether an illiquid security should in fact be treated as liquid. The Registration Statements stated that "[o]ver the past several years, strong institutional markets have developed for various types of restricted securities" and that presumptively illiquid securities will be treated as liquid by the Fund "if they satisfy liquidity standards established by the Board of Trustees." The Registration Statements further represented that the Board will "monitor their liquidity" and review pertinent factors "in determining whether to treat any such security as liquid for purposes of" the 15% illiquidity limit. These statements, combined with the statements that not more than 15% of the portfolio was illiquid and that investors could timely redeem their shares, assured investors that the Fund was sufficiently liquid – even if certain securities on their face were typically illiquid.

---

[7] Since the Fund did not provide CUSIPs for its securities, Plaintiffs investigated each security individually and determined its CUSIPs. Even though Plaintiffs were able to identify most of the CUSIPs, Plaintiffs were unable to analyze a small number of securities for which CUSIPs were unavailable. If Plaintiffs had the CUSIPs for those additional securities, it is likely that Plaintiffs' analysis would have revealed that an even greater portion of the Funds' securities were illiquid because the lack of CUSIPs indicate that a security does not have an active market.

74. Despite the statements about an active market for restricted securities and the Board's liquidity standards, the Fund was not sufficiently liquid. Securities that were typically illiquid were – in fact – illiquid. An in-depth analysis of the Fund's securities, by type of security, demonstrates that substantially more than 15% of the Fund's portfolio was comprised of illiquid securities throughout the Class Period. This analysis determined the percentage of the Fund's assets which: (i) were admitted by the Fund to be illiquid; and (ii) are typically illiquid or not readily marketable.

75. First, the Fund admitted in the Registration Statements that Claims, Senior Loans, private equities, and securities with restrictions on resale were illiquid or likely to be illiquid. Second, the assets that are typically illiquid or not readily marketable are the following:

(a) **Term Loans**: Comprise a broad range of assets, including leveraged finance loans, real estate lending and infrastructure finance, SME loans (direct lending) and private placement note/loan issues. Term Loans do not have a convenient secondary market allowing investors to quickly sell them for cash. Term loans may be highly bespoke, (*i.e.* no standardization of documentation or commercial terms), having been created according to a certain set of specifications stipulated by the investor. Or the asset may be a one-off with no exact comparable in the market, such as infrastructure term loans.

(b) **Level 3 Fair Valued Securities**: Level 3 fair valued securities are those which are valued using Level 3 inputs. The valuation of these assets are based upon unobservable inputs that are significant to the valuation. In contrast with Level 1 securities which are valued based upon unadjusted quoted prices in active markets for identical assets, Level 3 securities by definition do not have a comparable active market and are thereby illiquid.

(c) **Preferred Stock**: Distressed preferred stock typically has a liquidity risk.

- 26 -

(d)   **_Convertible Preferred Stock_**:  The Fund held convertible preferred stocks that are under restriction for resale, which limited the ability to trade the securities.

76.   The sum of: (i) the assets which the Fund admitted are illiquid; and (ii) the assets which are typically illiquid results in substantially more than 15% of the Fund's securities being illiquid.  Specifically, the illiquid portion of the Fund's portfolio was 24.86% as of April 30, 2013, 23.09% as of April 30, 2014, and 30.85% as of April 30, 2015.  The results of the analysis are reflected in the below chart:

| Report Date | Illiquid Assets % | Illiquid Assets by Market Value ($) | Net Assets by Market Value ($) |
|---|---|---|---|
| 4/30/2013 | 24.86% | 298,602,315.63 | 1,201,135,622.00 |
| 4/30/2014 | 23.09% | 707,132,193.23 | 3,062,504,085.00 |
| 4/30/2015 | 30.85% | 759,831,251.03 | 2,462,986,227.00 |

77.   This analysis reveals that the Fund's illiquid assets grew from nearly $300 million as of April 30, 2013 to almost $760 million as of April 30, 2015.  Furthermore, even though the Fund's net assets declined by over $500 million between April 30, 2014 and April 30, 2015, the Fund's illiquid assets grew by over $52 million.

78.   As reported in an article about the Focused Credit Fund on _Seeking Alpha_ on December 14, 2015:

> By the standards of most mutual funds, only level 1 assets are deemed to be liquid - that is, capable of being sold at a price near their valuation in a reasonable period of time.  The Third Avenue Focused Credit Fund had over half its assets in level 2 and almost 20% in level 3, which sometimes is called "mark to myth."  These figures stand out starkly against the SEC's general rule that open-end funds are to limit their holdings of illiquid securities to 15% of assets or less.
>
> *        *        *
>
> Looking at Focused Credit Fund's holdings, it appears that the deep value methodology that the fund adopted almost necessarily led to endemic illiquidity because securities of that type trade infrequently.

**The Fund's Size Hampered Liquidity**

79.     In January 2014 the SEC issued a risk management guidance update for fixed income markets investing.[8]  The guidance encouraged investment advisors for bond mutual funds (such as the Focused Credit Fund) to evaluate and stress test their liquidity and ability to meet investor redemption requests and to assess the adequacy of their disclosures to investors regarding related risks.

80.     Contrary to the SEC guidance, the Fund continued to grow its illiquid portfolio and failed to diversify its portfolio away from highly illiquid assets.  Due to the nature of the Fund's investments and the fact that the market for those types of securities was limited, it was crucial that the Fund not become so large that it could not adequately manage the portfolio.  According to a Third Avenue Management Due Diligence Questionnaire from 2013 (the "DDQ"), the Fund admitted it should not accumulate more than $3 billion in assets.  The DDQ, which was not for public distribution, stated that the "capacity limit" for the strategy employed by the Focused Credit Fund was $3 billion.  TAM, however, likely interested in the attractive management fees associated with such a large Fund, ignored the Fund's capacity limit and grew the Fund well beyond $3 billion. In 2012, the Fund had roughly $1 billion in assets – by the end of June 2014, the Fund had more than tripled its assets to $3.49 billion.  Unbeknownst to the public, the Fund was nearly $500 million (or more than 16%) over the capacity which it believed it could effectively manage.

81.     As reported in *The Wall Street Journal*, when the Fund reached its peak of approximately $3.5 billion in assets, an investor in the Fund approached the Fund's portfolio manager, Thomas Lapointe, out of concern that the Fund had grown too large.  Lapointe reportedly responded that he "was dealing" with the growth even as he allowed the Fund to take more of

---

[8]     *Guidance Update*, January 2014, *available at* http://www.sec.gov/divisions/investment/guidance/im-guidance-2014-1.pdf (last visited July 12, 2016).

investors' money.  As reported in a December 23, 2015 Reuters article entitled *Hidden In Plain Sight: Big Risks At Failed Third Avenue Fund Were Clear To Some*, one financial advisor was assured by the Fund that "[w]e're under control, we have plenty of cash."

82.   *The Wall Street Journal* also reported that defendant Barse himself, citing a former employee who worked with him, internally "***voiced some concern about the risk of holding hard-to-sell assets while allowing investors to sell out in a day***" and "***was worried about the mismatch***." Unfortunately for the Fund's shareholders, these internal concerns were not made public until it was too late.

### The Poor Liquidity of the Fund and Its Inability to Meet Redemptions Led to Its Downfall

83.   At the end of the Class Period, the Fund admitted that it was not sufficiently liquid to meet redemptions without negatively impacting the Fund's NAV.  Indeed, when Third Avenue applied to the SEC for permission to suspend redemptions from the Fund (the "Suspension Application"), it acknowledged that redemptions needed to be suspended due to the large amount of redemptions requested from Fund investors over the preceding year, with particular emphasis on the prior six months.  Third Avenue told the SEC that the "circumstances leading to the request for relief are linked to the extraordinary level of redemptions requested from the Fund's investors over the past six months" and that the "ongoing reduction of liquidity in the Fund's portfolio securities is related to a number of factors including an imbalance between selling interest and buying interest."

84.   In the Suspension Application, Third Avenue stated that the "Fund has experienced a total of $1.1 billion in estimated net outflows" from January 1, 2015 to December 9, 2015. Furthermore, Third Avenue admitted that there was a direct connection between redemptions and a reduction in the Fund's NAV.  Third Avenue stated, "in November 2015, the Fund experienced a total of $317 million in estimated net redemptions, and the Fund's Institutional Class net asset value

per share fell from $7.81 to $7.08 and its Retail Class net asset value per share fell from $7.82 to $7.09." Similarly, Third Avenue wrote, "[o]n December 9, 2015, after considering the environment the Fund was in and the likelihood that incremental sales of portfolio securities to satisfy additional redemptions would have to be made at prices that would unfairly disadvantage all remaining shareholders, the Board determined that the fairest action on behalf of all shareholders would be to adopt a plan of liquidation."

85.     As alleged herein, the liquidity problems that ultimately brought down the Fund existed throughout the Class Period. Those liquidity problems, however, were not promptly revealed to the public because for most of the Class Period purchases exceeded redemptions (net purchases), which allowed the Fund to manage its cash flow for redemptions. Between the start of the Class Period and April 30, 2014, the Fund grew its assets from approximately $1 billion to over $3.2 billion, and by July 2014 to over $3.5 billion. During this same period, purchases outpaced redemptions and net purchases (new purchases minus redemptions) grew from approximately $124 million for the six months ended April 30, 2013 to over $1.1 billion for the period ended April 30, 2014. The Fund's NAV remained strong during the period and closed at $10.89 (TFCVX) and $10.88 (TFCIX) on March 1, 2013, and $11.95 (TFCVX) and $11.94 (TFCIX) on April 30, 2014.

86.     Things started to change during 2014, however, as redemptions started to pick up. Even though the Fund maintained that it was sufficiently liquid and complied with the SEC's 15% liquidity rule, the reality was very different. As redemptions increased, the Fund was limited with respect to which assets it could sell since many could not be sold at the values attributed to them by the Fund. This caused the Fund to sell its most liquid assets to cover investor redemptions, thereby

increasing its concentration of illiquid and underperforming assets and further impairing its ability to meet future redemptions.

87.     During the spring and summer of 2014, the upward trend of net purchases started to reverse and redemptions increased relative to new purchases.   Net purchases declined from approximately $1.1 billion for the six months ended April 30, 2014 to approximately $289 million for the six months ended October 31, 2014.  In order to meet these increased redemptions, the Fund liquidated its most liquid securities and depleted half of its cash reserves.  Cash, which represented 12.80% of the Fund's assets as of April 30, 2014, had dropped to 6.5% by October 31, 2014.  During this same period, the Fund's NAV weakened, from a closing price of $11.95 (TFCVX) and $11.94 (TFCIX) on April 30, 2014, to a closing price of $10.61 (TFCVX) and $10.60 (TFCIX) on October 31, 2014.

88.     Things continued to worsen at the Fund thereafter as, for the first time during the Class Period, redemptions exceeded new purchases (net redemptions).  For the six months ended April 30, 2015, the Fund experienced net redemptions (more sellers than buyers) of more than $186 million.  Since the Fund was not sufficiently liquid to adequately handle redemptions, the Fund sold more assets, depleted more of its cash, and further reduced the liquidity of the portfolio.  By April 30, 2015, cash made up only 4.67% of the Fund's assets and the Fund's NAV closed at $9.39. Redemptions continued to surge for the remainder of 2015.  Since the Fund had already sold its most liquid positions and depleted most of its cash, it was forced to sell illiquid assets, causing a further decline in the NAV to $6.48 (TFCVX) and $6.46 (TFCIX) on December 10, 2015.

89.     The Fund's net purchases (more buyers than sellers) or net redemptions (more sellers than buyers) and total assets are reflected in the below table:

| 6 MONTHS ENDING | | NET PURCHASES or (NET REDEMPTIONS) | TOTAL ASSETS |
|---|---|---|---|
| 30-Apr-13 | | | |
| | Investor | $55,101,952 | |
| | Institutional | $69,013,060 | |
| TOTAL | | $124,115,012.00 | $1,238,178,636.00 |
| 31-Oct-13 | | | |
| | Investor | $385,917,469 | |
| | Institutional | $313,457,690 | |
| TOTAL | | $575,260,147.00 | $1,802,062,443.00 |
| 30-Apr-14 | | | |
| | Investor | $652,702,792 | |
| | Institutional | $462,059,359 | |
| TOTAL | | $1,114,762,151.00 | $3,245,666,852.00 |
| 31-Oct-14 | | | |
| | Investor | $205,710,542 | |
| | Institutional | $1,198,710,886 | |
| TOTAL | | $289,659,277.00 | $3,025,581,869.00 |
| 30-Apr-15 | | | |
| | Investor | ($124,230,765) | |
| | Institutional | ($62,130,296) | |
| TOTAL | | ($186,361,061.00) | $2,481,369,178.00 |
| 31-Oct-15 | | | |
| | Investor | ($310,127,088) | |
| | Institutional | ($628,465,196) | |
| TOTAL | | ($752,231,223.00) | $1,383,338,565.00 |

90.     As admitted by Third Avenue in the Suspension Application, there was a direct correlation between the illiquidity of the Fund, its inability to handle redemptions, and the decline in the Fund's NAV.  Indeed, since the Fund was not sufficiently liquid, an increase in redemptions caused the sale of illiquid securities for less than their reported prices, negatively impacting the NAV.

91.     The below graph depicts the impact that net purchases and net redemptions had on the Fund's NAV:



92.     Furthermore, contrary to Third Avenue's characterization of the level of redemptions as "extraordinary," other high-yield funds experienced similar redemptions but did not suffer the same disastrous fate as the Fund.  As set forth in the below chart, even though these other funds received large redemption requests, they did not decline as much as the Focused Credit Fund and, because they did not have the same liquidity issues as the Fund, they did not seek to suspend redemptions:

| Fund | Outflows 2015 | 2015 Redemptions as a Percentage of Assets | 2015 Performance | 2016 Performance (as of 7/7/16) |
|---|---|---|---|---|
| Third Avenue Focused Credit Fund | -$978.8M | 41% | -30.09% | -0.76% |
| Aberdeen Global High Income Fund | -$783.3M | 38% | -8.73% | 3.75% |
| Metropolitan West High Yield Bond Fund | -$439.4M | 29% | -2.18% | 3.63% |
| Fidelity Series High Income Fund | -$1.52B | 22% | -6.30% | 7.65% |
| Ivy High Income Fund | -$1.81B | 22% | -7.37% | 7.15% |

### The Fund Suspends Redemptions

93.     Due to the devastating impact redemptions were having on the Fund, the Board held a call on November 30, 2015 to discuss "the level of redemption requests, liquidity steps and potential other actions."  Third Avenue admitted that it had become apparent during the week of December 7, 2015 that the Fund was unable to find buyers for its securities, at prices it carried the assets at, and that redemptions would likely continue.

94.     On December 10, 2015 (in a letter dated December 9, 2015), the Company notified shareholders that due to liquidity issues, Third Avenue froze all redemptions and adopted a plan of liquidation for the Fund (the "Plan of Liquidation" or the "Plan").  Defendant Barse attempted to justify the Plan by claiming that:

> We believe that, with time, FCF would have been able to realize investment returns in the normal course.  Investor requests for redemption, however, in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for FCF going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage the remaining shareholders. . . . *while we believe that these investments are likely to generate positive returns for shareholders over time, if FCF were forced to sell those investments immediately, it would only realize a portion of those investments' fair value given current market conditions.*

95.     Prior to December 10th, as a result of the Fund being "unable to find buyers" for its overpriced assets, and $1.1 billion in estimated net outflows for the year to date, the Fund was in a free fall.  The Fund was unable to sell its securities at close to previously-stated prices.  On December 10, 2015 (after the Fund had suspended redemptions), TFCVX was worth at $6.48 per share and TFCIX was worth $6.46 per share, more than 45% below their Class Period highs.

96.     The redemption freeze however, was done without SEC approval.  Section 22(e) of the ICA only permits a fund to suspend redemptions in two narrow situations.  First, a fund may suspend redemptions for any period during which trading on the NYSE is restricted, as determined by the SEC.  Second, a fund may suspend redemptions for any period during which an emergency

exists, *as determined by the SEC*, as a result of which it is not reasonably practicable for the fund to: (1) liquidate its portfolio securities; or (2) fairly determine the value of its net assets.[9]

97.     According to media reports, on December 11, 2015, days after shareholders were barred from getting their money out of the Fund, defendant Barse presented a last ditch effort to sell the Fund's assets to a private equity firm.  The move, which was promptly rejected by the Board, resulted in Barse's termination.

98.     With Barse out, on December 16, 2015, Third Avenue finally sought (through their Suspension Application) – and subsequently received the same day – approval from the SEC for the redemption freeze.  The Suspension Application described how "the circumstances leading to the request for relief are linked to the extraordinary level of redemptions requested from the Fund's investors over the past six months."  The Defendants further admitted in the Suspension Application that the Fund's liquidity issues caught up to them when they were forced to realize the "imbalance between selling interest and buying interest" of their over-priced and illiquid assets.  The Suspension Application also revealed Defendants' belief that if their Suspension Request was not approved by the SEC, shareholders would continue to face the "detrimental effect on the Fund of the ongoing reduction in the liquidity of the Fund's portfolio securities [and] the very recent extreme difficulty the Fund has encountered in selling portfolio securities at prices TAM deemed to be fair and the ongoing redemptions that the Fund expected."

---

[9]     Even the types of "emergenc[ies]" that would allow for a redemption halt are far and few.  *See* Investment Company Act Rel. No. 14459 (June 6, 1985).  One acceptable situation, described by the SEC, was the result of a snowstorm where local authorities declared a state of emergency.  *Id.*  However, the SEC noted that these emergency closings are to be distinguished from situations where a fund or its transfer agent experiences operational problems: "Where operational problems unrelated to an emergency closing result . . . the adviser, transfer agent or another responsible party may be liable to the fund for any resulting [damage.]."  *Id.*

99.     The SEC's Temporary Order permitting the redemption halt (2015 SEC LEXIS 5113, Release No. IC-31943 (Dec. 16, 2015)) (the "Temporary Order"), issued on December 16, 2015, acknowledged the egregiousness of Third Avenue's unauthorized freezing of redemptions. Specifically, the Temporary Order described how the SEC "staff expressed concerns" in discussions with Third Avenue when the Fund took it upon itself to stop redemptions. Following these discussions, Third Avenue approved a partial cancellation of the Plan, conditioned on the SEC's approval of the Temporary Order to suspend shareholder redemptions and allow the Fund to "wind[] up of its affairs."

100.    On December 16, 2015, Third Avenue issued a second letter to shareholders stating that it had struck a deal with the SEC that would require it to transfer assets back into the Focused Credit Fund so that investors could receive more transparency on the liquidation, while continuing to freeze redemption requests. In other words, shareholders' money was still trapped. The letter also stated that the initial shareholder distribution would include only 9% of the Fund's capital, indicating that the Fund could not quickly sell 91% of its assets at reasonable or above fire-sale prices.

101.    Analysts were shocked and outraged by the unprecedented collapse and redemption freeze at the Fund. Jim Cramer, a well-respected financial news commentator on CNBC, summarized the market sentiment:

> Now, there are two parts to this Third Avenue story. First, there's the unprecedented decision by the firm's former CEO, David Barse -- who no longer works for Third Avenue as of this weekend -- to cease redemptions of a mutual fund without even consulting the SEC. This Focused Credit Fund wasn't a hedge fund that could have special rules, like Stone Lion Capital Partners, another fund that cut off redemptions Friday evening. Focused Credit is a mutual fund, and implicit in the nature of a mutual fund is the notion that there's a posted price of what a fund's worth and if you want to you redeem your shares and get that price today.
>
> ***That's just mutual fund management gone rogue. There are rules. Rules have to be followed, including running money in a responsible enough way that you have liquidity on hand to meet redemptions when your fund is doing badly.*** You stop buying, you start selling and you raise cash aggressively at any price because, when

your fund is down 27% as this was, according to published reports, going into this catastrophic decision, you have to accept that people will want their money back.

The unilateral decision to cease redemptions on the spot to me is tantamount to a repudiation of the laws set up to protect investors in these kinds of vehicles. I do not know how the authorities can overlook this decision as Focused Credit was some sort of a hedge fund with a lock-up.

*     *     *

Which brings me to the second damning part of the equation here. ***Looking at this list, I can't believe that this fund had the guts to say that it was only down 27%. I think that these pieces of paper were so ghastly that in order to sell them they would be worth half of what they might be carried out. And that's why I think it had to close. Only a fool would bid on most of these assets. I don't even know at year-end if they could get prices for them to close their books.***

102.    Cramer's calls for the authorities to step in were answered shortly thereafter with the Secretary of the Commonwealth of Massachusetts, William F. Galvin, announcing that his "office is opening this investigation to determine when and how this decision was made and to determine the extent of Massachusetts investors who have been impacted by this unprecedented decision on the part of [Third Avenue] fund management." Likewise, a spokeswoman for the SEC stated that the agency was closely monitoring the Fund: "[c]ommission staff is on site, and we continue to closely evaluate the fund's efforts to ensure it provides an orderly process that best protects investors."

103.    Despite government action, a substantial portion of investors' money had already been erased. As revealed in its Annual Report for the period ended October 31, 2015, which was filed with the SEC on December 24, 2015, the Fund's net assets had plummeted to $1.4 billion by period end, and the Fund had lost approximately 19% for the year, compared to the Barclays Capital U.S. Corporate High-Yield Index and the Credit Suisse Leveraged Loan Index returns of -1.94% and 0.81%, respectively, for the same period. The 2015 Annual Report cited temporary and permanent impairments in a number of Fund assets as among the reasons for the Fund's abysmal performance.

104.     Separately, Morningstar would report that by December 2015 the Fund's performance had further deteriorated, and that the Fund was *down 27%* on the year compared to less than 4% among high-yield funds as a category.

### THE REGISTRATION STATEMENTS AND PROSPECTUSES CONTAINED INACCURATE STATEMENTS OF MATERIAL FACT AND OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN

105.     Throughout the Class Period, Defendants issued and offered for sale shares of the Fund.  The Registration Statements, including Prospectuses, SAIs, Annual, Semi-Annual, and Quarterly Reports used throughout the Class Period to register and offer shares of the Fund to Plaintiffs and the Class contained untrue statements of material facts and omitted material facts necessary to make the statements therein not misleading.  Even though the Registration Statements issued during the Class Period were not perfectly identical, they did contain many of the same untrue statements set forth below and were rendered misleading by the same omissions.

### The Registration Statements Misrepresented the Liquidity of the Portfolio

106.     Throughout the Class Period, the Registration Statements consistently represented that no more than 15% of the Fund's net assets are in illiquid securities, stating in pertinent part, as follows:

> ***None of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid***.  Generally speaking, an illiquid security is any asset or investment of which a Fund cannot sell a normal trading unit in the ordinary course of business within seven days at approximately the value at which a Fund has valued the asset or investment, including securities that cannot be sold publicly due to legal or contractual restrictions.  The sale of illiquid securities often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets.  Restricted securities may sell at a price lower than similar securities that are not subject to restrictions on resale.

107.    Similarly, the Registration Statements represented that the Fund would not invest more than 15% of its assets in securities which are not readily marketable:

> ***Each Fund may invest up to 15% of its total net assets in securities which are not readily marketable, including those which are restricted as to disposition under applicable securities laws ("restricted securities")***. Restricted securities and other securities and assets for which market quotations are not readily available are valued at "fair value," as determined in good faith by the Committee as authorized by the Board, under procedures established by the Board.

108.    In 2015, the Registration Statements added, "[u]nder normal circumstances, none of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid."

109.    The statements referenced above in ¶¶106-08 were inaccurate statements of material fact when made and misleading because of the following facts that existed at the time of the Registration Statements:

(a)    More than 15% of the securities held by the Fund were illiquid and not readily marketable;

(b)    The Fund did not maintain a level of portfolio liquidity that was appropriate under the circumstances;

(c)    There were no active markets for more than 15% of the Fund's securities which may make selling those securities difficult or cause the Fund to receive substantially less than their reported values;

(d)    The Fund failed to monitor assets closely and make the appropriate adjustments to valuations as circumstances and conditions changed;

(e)    Due to Fund liquidity issues, investors were exposed to a risk that if share purchases decreased, or if the Fund experiences more outflows than inflows, the Fund would be forced to sell illiquid assets for less than their reported prices; and

(f)      If the Fund is forced to sell illiquid assets due to redemptions, it could decrease the liquidity of the portfolio or cause a decline in the Fund's NAV.

110.     The Registration Statements stated that active markets may exist for securities which are typically illiquid, stating in pertinent part, as follows:

> *Over the past several years, strong institutional markets have developed for various types of restricted securities, including repurchase agreements, some types of commercial paper, and some corporate bonds and notes (commonly known as "Rule 144A Securities").  Securities freely salable among qualified institutional investors under special rules adopted by the SEC, or otherwise determined to be liquid, may be treated as liquid if they satisfy liquidity standards established by the Board of Trustees (the "Board")*.  The continued liquidity of such securities is not as well assured as that of publicly traded securities, and accordingly, *the Board will monitor their liquidity.  The Board will review pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities in determining whether to treat any such security as liquid for purposes of the foregoing 15% test*.  To the extent the Board treats such securities as liquid, temporary impairments to trading patterns of such securities may adversely affect a Fund's liquidity.

111.     The statement referenced above in ¶110 that "strong institutional markets have developed for various types of restricted securities, including repurchase agreements, some types of commercial paper, and some corporate bonds and notes" was misleading because the markets for such assets were not as strong (allowing for a sale within 7 days) as investors were led to believe.  Indeed, the types of assets discussed in ¶110 contributed to the Fund holding more than 15% in illiquid securities.  Additionally, the statement referenced above in ¶110 was misleading because the Fund considered certain Rule 144A securities to be liquid even though they were illiquid.  Furthermore, contrary to the statement that the "Board will monitor their liquidity," the Fund understated the amount of illiquid securities held by the Fund.  Thus, either the Board did not monitor liquidity or did monitor liquidity and then failed to take appropriate measures to improve the liquidity of the Fund.

112.   The Registration Statements advised shareholders that "should illiquid assets ever exceed 15% of a Fund's net assets, the Adviser would work with the Board to determine the appropriate steps and timeframe for alleviating such excess."

113.   The statement referenced above in ¶112 was an inaccurate statement of material fact when made because of the reasons set forth in ¶109 and because even though illiquid assets exceeded 15% throughout the Class Period, TAM and the Board failed to work together and take appropriate steps for alleviating such excess for most of the Class Period.

114.   The Registration Statements from 2013 to 2015 listed the percentage (as calculated by the Fund) of assets that were "restricted securities and other assets for which market quotations were not readily available" and which were valued at "fair value" by the Defendants.  From 2014 through 2015, the Registration Statements listed the percentage of illiquid and not readily marketable assets as calculated by the Fund.

|  | 2013 Semi-Annual Report (6/25/13) | 2013 Annual Report (12/30/13) | 2014 Semi-Annual Report (6/20/14) | 2014 Annual Report (1/6/15) | 2015 Semi-Annual Report (6/26/15) |
|---|---|---|---|---|---|
| Illiquid | -- | -- | -- | 14.25% | 12.22% |
| Fair Valued/Not Readily Marketable | .12% | .55% | 2.69% | 4.58% | 6.78% |

115.   The statement referenced above in ¶114 was an inaccurate statement of material fact when made because of the reasons set forth in ¶109 and because the Fund held more illiquid securities, and securities that were not readily marketable and valued at fair value, than represented.

**The Registration Statements Misrepresented
Shareholders' Ability to Redeem Their Shares**

116.   The Registration Statements described the process for redeeming shares:

**HOW TO REDEEM SHARES**

**General**: You may redeem your shares on any day during which the NYSE is open for trading, either directly from a Fund or through certain broker-dealers or other financial intermediaries. Fund shares will be redeemed at the NAV next calculated after your order is received in good order by a Fund or its designees.

          \*       \*       \*

> **Payment of Redemption Proceeds**: A Fund will usually make payment for redemptions of Fund shares within one business day, but not later than seven calendar days, after receipt of a redemption request.

117.    The Registration Statements further described the narrow situations in which redemptions could be halted:

> In unusual circumstances, such as in the case of a suspension of the determination of NAV, the right of redemption is also suspended and shareholders will receive payment of the net asset value next determined after termination of the suspension. The right of redemption may be suspended or payment upon redemption deferred for more than seven days: (a) when trading on the New York Stock Exchange ("NYSE") is restricted; (b) when the NYSE is closed for other than weekends and holidays; (c) when the SEC has by order permitted such suspension; or (d) when an emergency exists making disposal of portfolio securities or valuation of net assets of a Fund not reasonably practicable; provided that applicable rules and regulations of the SEC shall govern as to whether the conditions prescribed in (a), (c) or (d) exist.

118.    The statements referenced above in ¶¶116-17 were inaccurate statements of material fact when made and misleading because of the following facts that existed at the time of the Registration Statements:

(a)    Due to portfolio liquidity issues, there was a risk that investors would be unable to redeem their shares within the one day represented by the Fund or even the seven days required by law;

(b)    Substantial redemptions by shareholders could negatively impact the Fund's NAV and incremental sales of portfolio securities to satisfy additional redemptions would have to be made at prices that would unfairly disadvantage all remaining shareholders; and

(c)    A substantial amount of redemptions could force the Fund to unilaterally suspend redemptions, or seek approval from the SEC to suspend redemptions, so that the Fund could liquidate securities over time.

**The Registration Statements Inaccurately
Marketed the Fund as a High-Yield Fund**

119.    Throughout the Class Period, the Registration Statements discussed the types of

investments the Fund would make:

> *The Fund seeks to achieve its objective mainly by investing in bonds and other types of credit instruments and intends to invest a substantial amount of its assets in credit instruments that are rated below investment grade by some or all relevant independent rating agencies, including Moody's, S&P and Fitch.*  The Fund does not seek to invest for current yield, but rather for total return, which may include investment returns from a combination of sources including capital appreciation, fees and interest.  Under normal circumstances, at least 80% of the Fund's net assets (plus the amount of any borrowing for investment purposes) will be invested in bonds and other types of credit instruments.
>
> Credit instruments include high-yield bonds (commonly known as "junk bonds" or "junk debt"), bank debt, convertible bonds or preferred stock, loans made to bankrupt companies (including debtor-in-possession loans), loans made to refinance distressed companies and other types of debt instruments.  High-yield bonds, generally, are bonds that are rated below investment grade by some or all of the relevant rating agencies.  Additionally, certain other high-yield bonds may be unrated by rating agencies but are determined by the Adviser to be of similar quality as other below investment grade bonds and credit instruments.  Bank debt is debt that has been issued to one or more banks or commercial lenders by a company and usually carries a lien or senior loan on the assets of the company.  This type of debt is often syndicated among large institutions and traded among them and in private secondary markets.  Loans made to bankrupt companies or to refinance distressed companies will most often have a lien on the assets of the company and can have a super-priority over other obligations of the company.  Convertible debt is debt that is convertible into other securities, usually common stock of the company, or can be exchanged for securities of a related issuer.  In making these investments, the Adviser will seek to purchase instruments that the Adviser believes are undervalued, and the Adviser may sometimes use derivatives for hedging.
>
> *The Fund may have significant investments in distressed and defaulted securities and intends to focus on a relatively small number of issuers.*  The Fund may invest without limitation in distressed securities or other debt that is in default or the issuers of which are in bankruptcy
>
> *       *       *
>
> *The Fund may also purchase significant positions in equity securities, including common stocks and convertible securities.*  Such assets will not be considered "credit instruments" for purposes of this requirement.

120.     Throughout the Registration Statements, Defendants compared the Fund's average annual total returns to the "relevant market performance" of high-yield bonds.  To accomplish this, the Fund used the Barclays Capital U.S. Corporate High-Yield Index (the "Barclay's Index") and Credit Suisse Leveraged Loan Index (the "Credit Suisse Index") as comparisons for the Fund.

121.     The statements referenced above in ¶¶119-20 were inaccurate statements of material fact, and the omission of material facts rendered them misleading when made, because the description of the Fund's Investment Objective indicates that the Fund was a high-yield fund when it was really a highly illiquid distressed debt fund.  Additionally, the comparison of the Fund to the Barclay's Index and the Credit Suisse Index as referenced in ¶120 above was misleading because those were appropriate indexes for a high-yield fund but the Focused Credit Fund was not properly categorized as a high-yield fund.  Further, the statements that the "Fund may have significant investments in distressed and defaulted securities" and the "Fund may also purchase significant positions in equity securities, including common stocks" made it appear as if the Fund's investments in distressed and defaulted securities would be around the same level as the Fund's investments in equity securities, even though the Fund invested in substantially more distressed and defaulted securities.

### The Registration Statements Misrepresented the Defendants' Ability to Properly Value Securities

122.     The Registration Statements described the Fund's NAV calculation methodology, stating in pertinent part, as follows:

> The NAV of each class of a Fund is determined by dividing the value of its allocable share of portfolio securities, cash, and other assets, including accrued interest and dividends, owned by the Fund, less all liabilities of the class, including its accrued expenses, by the total number of outstanding shares of the class.

- 44 -

123.     The Registration Statements stated that unrated bonds included in the portfolio would be, as part of the Fund's "Principal Investment Strategies," "of similar quality as other below investment grade bonds and credit instruments by the Adviser."

124.     The statements referenced above in ¶¶122-23 were inaccurate statements of material fact when made and misleading because the Fund did not properly identify illiquid securities or take into account the illiquid nature of its assets when determining their values.   Indeed, as the Fund admitted at the end of the Class Period, the Fund was forced to suspend redemptions because the illiquidity of its securities rendered the Fund unable to obtain the prices for securities as they were reportedly valued at by the Fund.   Additionally, the statement in ¶123 that unrated bonds were "of similar quality" as other below investment grade bonds was inaccurate because many of the Fund's unrated securities were illiquid and of lesser quality.

### Misrepresentations in the Certifications

125.     Throughout the Class Period, the Fund filed Certifications which were attached to its reports to shareholders.   Each report discussed the performance of the Fund and its holdings. Certifications for the 2013, 2014 and 2015 Quarterly, Semi-Annual and Annual Reports were signed by defendants Barse and Dugan.

126.     The Certifications, which were substantially similar if not identical throughout the Class Period, certified that:

1.       I have reviewed this report . . . of Third Avenue Trust;

2.       Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the registrant and have:

(a)    *Designed such disclosure controls and procedures*, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information* relating to the registrant, including its consolidated subsidiaries, *is made known to us by others within those entities*, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    *Evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the second fiscal quarter of the period covered by this report that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

- 46 -

127.   In addition to the Certifications referenced above, the Semi-Annual and Annual Reports contained an additional statement in which Barse and Dugan certified that:

> The undersigned officer of Third Avenue Trust (the "Company"), hereby certifies, to the best of his knowledge, that the Company's Report on Form N-CSR for the period ended [] (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the *information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*

128.   The statements in the Certifications were each an untrue statement of material fact for the reasons set forth herein.

### The Prospectuses Failed to Include Principal Risks of Investing in the Fund

129.   Pursuant to Item 9(c) of Form N-1A entitled "Risks," the Fund's Prospectuses were required to disclose "the principal risks of investing in the Fund, including the risks to which the Fund's particular portfolio as a whole is expected to be subject and the circumstances reasonably likely to affect adversely the Fund's net asset value, yield, or total return." Additionally, pursuant to Item 4(b)(1)(i) of Form N-1A, the Prospectuses were required, based on the information given in response to Item 9(b), to "summarize the principal risks of investing in the Fund, including the risks to which the Fund's portfolio as a whole is subject and the circumstances reasonably likely to affect adversely the Fund's net asset value, yield, and total return."

130.   The Registration Statements, however, failed to disclose, as required under Items 9(c) and 4(b)(1)(i), the following:

    (a)   More than 15% of the securities held by the Fund were illiquid and not readily marketable;

    (b)   The Fund did not maintain a level of portfolio liquidity that was appropriate under the circumstances;

(c)     There were no active markets for more than 15% of the Fund's securities which may make selling those securities difficult or cause the Fund to receive substantially less than their reported values;

(d)     The Fund's NAV was artificially inflated because, by understating the illiquid nature of the Fund's portfolio, the Fund failed to appropriately apply an illiquidity discount to many of its securities;

(e)     Due to the substantial amount of the Fund's illiquid securities, it was reasonably likely that an increase in redemptions would force the Fund to sell illiquid securities for considerably less than their reported values, adversely impacting the Fund's NAV, yield, and total return;

(f)     If the Fund experiences substantially more redemptions than purchases it was reasonably likely that the Fund would be forced to freeze the redemptions of remaining shareholders to attempt to sell securities over time to minimize losses to shareholders;

131.    The Registration Statements during 2015 stated as follows:

During periods of reduced market liquidity, a Fund may not be able to readily sell debt securities at prices at or near their perceived value.  If a Fund needed to sell large blocks of debt securities to meet shareholder redemption requests or to raise cash, those sales could further reduce the prices of such securities.

132.    The statement referenced in ¶131 above failed to adequately warn investors of the risks of investing in the Fund.  The statement, which focused on individual securities, failed to disclose the liquidity problems with the Fund's overall portfolio.  The statement failed to disclose, at the time of the statement, substantially more than 15% of the Fund was invested in illiquid securities and an increase in redemptions was already negatively impacting the Fund.  Indeed, by that time, redemptions had already decreased the liquidity of the Fund and negatively impacted the Fund's NAV.  Furthermore, the above statement limited any risk to "periods of reduced market liquidity."

As alleged above, the Fund held a substantial amount of illiquid assets that would be difficult to sell regardless of whether a period of reduced market liquidity existed.  The inability of the Fund to sell illiquid securities at their listed values was not dependent upon a period of "reduced market liquidity" but rather the level of shareholder redemptions and the nature and values of the securities themselves.  Additionally, the above statement failed to disclose that a high level of redemptions could cause a suspension of redemptions due to the highly illiquid nature of the Fund.

**COUNT I**

**Violations of Section 11 of the Securities Act**
**Against Third Avenue, the Individual Defendants, and MJW**

133.    Plaintiffs repeat and reallege each and every allegation contained above.

134.    This Count is brought pursuant to Section 11 of the Securities Act [15 U.S.C. §77k], on behalf of the Class, against Third Avenue, the Individual Defendants and MJW (collectively, the "Section 11 Defendants").

135.    The Registration Statements were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

136.    Third Avenue is the registrant for the shares of the Fund, and as such is strictly liable for the false statements contained in the Registration Statements.  MJW, as the Fund's underwriter, and the Individual Defendants, as Trustees for the Fund, were responsible for the contents and dissemination of the Registration Statements.

137.    None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

138.    By reasons of the conduct herein alleged, each of the Section 11 Defendants violated, and/or controlled a person who violated, Section 11 of the Securities Act.

139.    Plaintiffs acquired shares of the Fund during the Class Period and pursuant to the Registration Statements.

140.    Plaintiffs and the Class have sustained damages.  The value of the shares of the Fund declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against Third Avenue, the Individual Defendants, MJW and TAM

141.    Plaintiffs repeat and reallege each and every allegation contained above.

142.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act [15 U.S.C. §77l(a)(2)], on behalf of the Class, against Third Avenue, the Individual Defendants, MJW and TAM (collectively, the "Section 12 Defendants").

143.    The Section 12 Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Fund offered pursuant to the Registration Statements, Prospectuses and other documents incorporated therein and were motivated by a desire to serve their own financial interests or those of the Fund or TAM.

144.    The Registration Statements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statements and participating in marketing the shares of the Fund to investors.

145.    The Section 12 Defendants owed to the purchasers of the shares of the Fund, including the Plaintiffs and other Class members, the duty to make a reasonable and diligent

investigation of the statements contained in the Registration Statements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Section 12 Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the offering materials as set forth above.

146.     Plaintiffs and other members of the Class purchased or otherwise acquired shares of the Fund pursuant to the defective Registration Statements.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of such untruths and omissions.

147.     By reason of the conduct alleged herein, the Section 12 Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and members of the Class who hold shares of the Fund have the right to rescind and recover the consideration paid for their shares of the Fund and hereby elect to rescind and tender those shares to the Section 12 Defendants sued herein.  Plaintiffs and Class members who have sold their shares of the Fund are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against AMG, the Individual Defendants and TAM

148.     Plaintiffs repeat and reallege each and every allegation contained above.

149.     This Count is brought pursuant to Section 15 of the Securities Act [15 U.S.C. §77(o)], on behalf of the Class, against AMG, the Individual Defendants and TAM (collectively, the "Section 15 Defendants").

150.     Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a director, Trustee and/or senior officer of Fund or other Defendant companies.  The

Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other Trustees, directors and/or officers and/or major shareholders of the Fund.

151.    TAM managed and controlled the business affairs of Third Avenue and was a control person of the Fund.  AMG was a control person of the Fund by virtue of its ownership of TAM and as the parent company of TAM had the ability to exercise control of the Fund.  TAM, AMG and their directors and/or officers each had a series of direct and/or indirect business and/or personal relationships with other Trustees, directors and/or officers of the Fund.

152.    Each of the Section 15 Defendants were each a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the sale of the shares of the Fund to be successfully completed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives, and designating Plaintiffs' counsel as Class counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages as to Count II; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  July 12, 2016

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
ANDREW L. SCHWARTZ


*/s/ Evan J. Kaufman*
EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
aschwartz@rgrdlaw.com

*Lead Counsel for Plaintiffs*

SACHS WALDMAN, P.C.
JOSEPH PAWLICK
1423 East Twelve Mile Road
Madison Heights, MI  48071
Telephone:  248/658-0800
248/658-0801 (fax)

*Additional Counsel for Lead Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ANTHONY DALLACASA ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Security          Transaction          Date          Price Per Share
                         *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __2__ day of July, 2016.

_____
ANTHONY DALLACASA

## SCHEDULE A

### SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/08/2013 | 393.062 | $10.81 |
| 12/19/2013 | 8.103 | $11.03 |
| 03/26/2014 | 6.356 | $11.55 |
| 06/25/2014 | 7.356 | $12.05 |
| 09/24/2014 | 7.264 | $11.20 |
| 10/21/2014 | 199.345 | $10.69 |
| 12/10/2014 | 17.333 | $9.95 |
| 12/10/2014 | 3.59 | $9.95 |
| 01/09/2015 | 58.075 | $9.66 |
| 03/25/2015 | 12.442 | $9.34 |
| 06/24/2015 | 14.917 | $9.20 |
| 09/23/2015 | 11.099 | $8.12 |
| 12/09/2015 | 12.785 | $6.65 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 07/08/2015 | 103.013 | $8.96 |
| 08/19/2015 | 96.897 | $8.70 |
| 12/02/2015 | 131.466 | $6.96 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2016, I caused a true and correct copy of the foregoing to be electronically transmitted to the Clerk of Court using the ECF System for filing.  Based on the records on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the ECF registrants of record.

/s/ Evan J. Kaufman
_____
EVAN J. KAUFMAN
