UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THIRD AVENUE MANAGEMENT LLC SECURITIES LITIGATION | ) ) ) ) ) |
| | Civil Action No. 1:16-cv-02758-PKC |
| This Document Relates To: | ) ) ) ) | CLASS ACTION |
| ALL ACTIONS | ) | **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM IN SUPPORT OF MOTION BY ALL DEFENDANTS TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT**

Robert A. Skinner
Amy D. Roy
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7560

Lee S. Gayer
1211 Avenue of the Americas
New York, NY 10036
(212) 841-0626

*Attorneys for Defendants Third Avenue Trust,
William E. Chapman, II, Lucinda Franks, Edward
J. Kaier, Eric P. Rakowski, Martin Shubik,
Charles C. Walden, and Patrick Reinkemeyer*

Arnold S. Jacobs
Sigal P. Mandelker
Alexandra K. Skellet
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000

Michael Allen Firestein
2049 Century Park East, 32nd Floor
Los Angeles, CA  90067-3206
(310) 557-2900

*Attorneys for Defendant Martin J. Whitman*

John P. Coffey
Jonathan M. Wagner
Samantha V. Ettari
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas,
New York, NY 10036
(212) 715-9393

*Attorneys for Defendants M.J. Whitman LLC,
Third Avenue Management, Inc., Vincent A.
Dugan, and Affiliated Managers Group, Inc.*

Scott A. Edelman
Robert C. Hora
Rachel P. Fissell
MILBANK, TWEED, HADLEY & MCCOY LLP
28 Liberty Street
New York, NY 10005-1413
(212) 530-5000

*Attorneys for Defendant David M. Barse*

# TABLE OF CONTENTS

**Page**

BACKGROUND ............................................................................................................... 4

A.    The Parties ........................................................................................................... 4

B.    The Fund's Investment Objective ........................................................................ 5

C.    The Fund's Disclosures of Its Investment Risks .................................................. 6

D.    The Fund's Disclosures of Its Underlying Holdings .......................................... 9

E.    The Fund's Performance, Worsening Market Conditions, and Ultimate
       Liquidation ......................................................................................................... 11

LEGAL STANDARD ................................................................................................... 12

ARGUMENT ................................................................................................................ 13

I.     THE CAC DOES NOT ALLEGE ANY ACTIONABLE FALSE
        STATEMENT OR OMISSION ........................................................................... 13

        A.    The Prospectuses Did Not Misrepresent the Liquidity of the Fund's
               Portfolio ................................................................................................... 14

               (i)     Determinations of Liquidity Levels and Alleged Statements
                        Regarding "Appropriate" Liquidity Are Not Actionable
                        Statements of Fact ......................................................................... 14

               (ii)    The CAC Misreads the 15% Limitation on Illiquid
                        Holdings, Which Is to Be Applied at the Time of Purchase ......... 17

               (iii)   The CAC Overstates the Fund's Level of Illiquidity ..................... 19

               (iv)    The CAC Ignores the Disclosures of the Fund's Portfolio
                        Holdings ....................................................................................... 21

        B.    The Prospectuses Did Not Misrepresent the Defendants' Ability to
               Value Securities Properly ......................................................................... 22

        C.    The Prospectuses Did Not Misrepresent Shareholders' Ability to
               Redeem Their Shares ............................................................................... 23

        D.    The Prospectuses Did Not Misrepresent the Fund as a High-Yield
               Fund ......................................................................................................... 24

        E.    There Were No Misrepresentations in the Certifications ......................... 25

        F.    The Prospectuses Did Not Fail to Include Principal Risks of
               Investing in the Fund ............................................................................... 26

        G.    A Reasonable Investor Could Not Have Been Misled Because the
               Risks of Investing in the Fund Were Fully Disclosed ............................. 27

II.    PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE PLAINTIFFS'
        ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE
        ALLEGED MISSTATEMENTS OR OMISSIONS ............................................. 31

III.  LEAD PLAINTIFF'S CLAIMS ARE BARRED BY THE ONE-YEAR
      NOTICE STATUTE OF LIMITATIONS ........................................................ 33

IV.   COUNT II FAILS AS TO THE INDIVIDUAL DEFENDANTS AND
      TAM, AS THEY ARE NOT SELLERS OF THE FUND'S SECURITIES
      FOR PURPOSES OF SECTION 12(a)(2)........................................................ 34

V.    THE CAC FAILS TO PLEAD A CLAIM OF CONTROL-PERSON
      LIABILITY AGAINST TAM, AMG, AND THE INDIVIDUAL
      DEFENDANTS ............................................................................................ 37

CONCLUSION.......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................12, 39

*Citiline Holdings, Inc., v. iStar Fin. Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010).........................................................36

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    928 F. Supp. 2d 705 (S.D.N.Y. 2013).........................................................36

*Clark v. Nevis Capital Mgmt., LLC*
    No. 04-cv-2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005)....................32

*Coronel v. Quanta Capital Holdings, Ltd.*,
    No. 7 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009).........................12, 18

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003).........................................................................27, 28

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).....................................................................................32

*Emps. Ret. Sys. of the Gov. of the V.I. v. JP Morgan Chase & Co.*,
    804 F. Supp. 2d 141 (S.D.N.Y. 2011).........................................................37, 38

*F.W. Webb Co. v. State St. Bank & Tr. Co.*,
    No. 09-cv-1241, 2010 WL 3219284 (S.D.N.Y. 2010) ...............................35, 36

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011).........................................................................23

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010).........................................................22

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002).........................................................................27

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012).........................................................39

*Hutchison v. Deutsche Bank Sec., Inc.*,
    647 F.3d 479 (2d Cir. 2011).........................................................................13

*In re Allied Capital Corp. Sec. Litig.*,
    No. 02-cv-3812, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) .................23

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005)................................................................13

*In re Global Crossing, Ltd. Sec. Litig.*,
  02-cv-910, 2005 WL 1907005 (S.D.N.Y. Aug. 5, 2005) ..................................38, 39

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................................22

*In re Lehman Bros. Sec. and ERISA Litig.*,
  681 F. Supp. 2d 495 (S.D.N.Y. 2010)................................................................38

*In re Livent, Inc. Sec. Litig.*,
  78 F. Supp. 2d 194 (S.D.N.Y. 1999).................................................................40

*In re Magnum Hunter Resources Corp. Sec. Litig.*,
  26 F. Supp. 3d 278, 300-301 (S.D.N.Y. 2014) ....................................................34

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 429 (S.D.N.Y. 2003)................................................................31

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010).............................................................................35

*In re ProShares Trust Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)............................................................2, 27, 28, 29

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
  382 F. Supp. 2d 1173 (N.D. Cal. 2004) .............................................................33

*In re WorldCom, Inc. Sec. Litig.*,
  No. 02-Civ-3288, 2004 WL 1097786 (S.D.N.Y. May 18, 2004) ...........................39

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
  62 F.3d 69 (2d Cir. 1995)...........................................................................4, 11

*Lentell v. Merrill Lynch & Co.*,
  396 F. 3d 161 (2d Cir. 2005).........................................................................31

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  11-cv-2700, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ...............................38, 39

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015).........................................................................15, 16, 23

*Omnicom Grp. Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010).............................................................................32

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998)........................................................................31

*Penn. Ave. Funds v. Inyx, Inc.*,
    No. 08-cv-6857, 2011 WL 1795931 (S.D.N.Y. May 5, 2011) ................................40

*Pinter v. Dahl*,
    486 U.S. 622 (1988)........................................................................34, 37

*Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)........................................................38

*Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011).................................................................34

*Ross v. Lloyds Banking Grp.*,
    No. 11-cv-8530, 2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012)...........................16

*RQSI Global Asset Allocation Master Fund Ltd. v. APERCU Int'l PR LLC*,
    No. 15-cv-00778, 2016 WL 1452434 (W.D. Ky. April 13, 2016) .........................15

*Sable v. Southmark/Envicon Capital Corp.*,
    819 F. Supp. 324 (S.D.N.Y. 1993) .........................................................22

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977).........................................................................16

*Shain v. Duff & Phelps Credit Rating Co.*,
    915 F. Supp. 575 (S.D.N.Y. 1996) .........................................................35

*Singh v. Schikan*,
    106 F. Supp. 3d 439, 451....................................................................17, 37

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008).................................................................34

*Tongue v. Sanofi*,
    816 F. 3d 199 (2d Cir. 2016)................................................................15, 16

*VanCook v. SEC*,
    653 F.3d 130 (2d Cir. 2011).................................................................32

*White v. Melton*,
    757 F. Supp. 267 (S.D.N.Y. 1991) .........................................................4

*Young v. Nationwide Life Ins. Co.*,
    183 F.R.D. 502 (S.D. Tex. 1998)...........................................................33

*Yu v. State St. Corp.*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011) ................................................................32, 33

STATUTES

15 U.S.C. § 77k(a) ..........................................................................................................13

15 U.S.C. §§ 77k(e) ........................................................................................................31

15 U.S.C § 77o..................................................................................................3, 37, 38, 40

15 U.S.C. § 80a-2(a)(41) .................................................................................................32

OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 12, 31

17 C.F.R. §§ 270.2a-4, 270.22c-1 ...................................................................................32

17 C.F.R. § 270.2a-7(d)(3)..............................................................................................18

17 CFR 210, 270, 274 (Sept. 22, 2015) ("2015 SEC Liquidity Release") ........................ passim

Registration Form Used by Open-End Management Investment Companies, 63 Fed. Reg.
    13,916-01, 13,940 (Mar. 23, 1998) .......................................................................18

Defendants jointly submit this memorandum in support of their motion to dismiss Plaintiff's Consolidated Amended Complaint ("CAC") pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

The Third Avenue Focused Credit Fund ("the Fund") was designed and advertised as an aggressive high-yield investment product, involving substantial disclosed risks and, for long-term investors, the potential for substantial gains. Investors enjoyed the upside in 2013 and 2014 as the Fund performed well. Then certain disclosed risks materialized, with increasing market illiquidity overtaking the Fund as the distressed debt market stalled in late 2015. The Fund's Board of Trustees ("the Board") ultimately decided to place the Fund's assets in a liquidating trust and effect an orderly liquidation, to protect remaining shareholders' interests and prevent the need to dispose of assets at fire-sale prices. An SEC order entered a week later authorized the suspension of redemptions during liquidation. The liquidation is currently underway.

Lead Plaintiff now seeks to recover investment losses on behalf of a putative class of shareholders in the Fund, alleging that the Fund's disclosures were materially misleading in violation of the Securities Act of 1933 (the "Securities Act"). The CAC primarily presents a series of grievances claiming that the Fund was managed in too risky a fashion – in particular that the Fund was "invested heavily in highly illiquid distressed and defaulted securities" to an extent "not appropriate for an open-end mutual fund." CAC ¶ 2. These grievances about management style do not make out a disclosure-based claim under the Securities Act because, given the Fund's extensive disclosures, no reasonable investor could have been misled about the nature of the Fund, the securities in which it invested, or the risks of investing in it – including illiquidity risk. The Fund disclosed its aggressive investment style – a "high yield" fixed income product that "may be appropriate for long-term investors seeking alternatives to equity

investments for long-term total return." The inherent risks of this strategy were front-and-center in the Fund's communications with investors, who were warned that the Fund was "not appropriate for short-term investors or those primarily seeking current income or for those investors who cannot withstand the risk of loss." In pursuit of high potential returns for long-term investors, the Fund disclosed its intention "to invest a substantial amount of its assets in credit instruments that are rated below investment grade," including so-called "junk bonds." The Fund documents explained in detail the types of high-yield securities that could be in its portfolio – including "significant investments in distressed and defaulted securities" – and the elevated risks associated with each. With respect to liquidity risk in particular, the Fund's disclosures repeatedly emphasized that the Fund could carry "greater liquidity risk" than other funds, as a number of positions in the portfolio carried intrinsically greater risk of illiquidity, especially in unfavorable market conditions. To provide investors with all available information, the Fund also regularly disclosed each of its specific underlying holdings.

The securities laws do not insure investors against disappointing results when fully-disclosed risks come to fruition, and that is exactly what happened here. As the Court of Appeals has recognized, "when a registration statement warns of the exact risk that later materialized, a . . . claim will not lie as a matter of law." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (internal citation omitted).

When the CAC does finally attempt to articulate specific misrepresentations and omissions, CAC ¶¶ 105–132, each of the six categories identified fails as a matter of law to state an actionable claim under the Securities Act – for one or more reasons. First, certain of the alleged misrepresentations are not actionable because they were expressions of judgment or opinion, not statements of objective fact, including statements about the Fund's liquidity levels

and that the Fund would have levels of liquidity "appropriate under the circumstances." *See id.* ¶ 3.  Second, the assertions that the Fund's disclosures violated various requirements – including the Fund's self-imposed 15% limitation on illiquid investments and the proper use of the label "high-yield," *see id.* ¶¶ 51-78, 119-21 – are based on the CAC's misinterpretation of those requirements and SEC guidance.[1]  Third, the assertion that the Fund's levels of illiquid holdings were misreported, see *id.* ¶¶ 106-15, is wrong, as the CAC's "calculation" of the Fund's liquidity is based on supposed measures of illiquidity created by Lead Plaintiff which bear no relation to the established SEC definition of illiquidity followed by the Fund.  Moreover, the Fund disclosed its full portfolio of holdings quarterly, making transparent the Fund's entire makeup, and afforded any investor an opportunity to evaluate the Fund's complete holdings multiple times a year.  In short, the CAC makes out no plausible claim that any of the six categories of supposed misrepresentations or omissions reflects a materially misleading statement of objective fact.  The CAC therefore lacks an essential element of a claim under Sections 11 and 12 of the Securities Act.

Without this foundation, Lead Plaintiff's case disintegrates.  There is no basis for control-person liability under Section 15(a) of the Securities Act without an underlying primary violation of Section 11 or 12, and, in any event, the CAC fails to allege any control relationship.  The CAC likewise fails to (i) demonstrate loss causation, as the alleged disclosure violations could not have affected the Fund's share price; (ii) allege that defendant Third Avenue Management LLC or the individual defendants were statutory sellers (as required under Section 12(a)(2)); or (iii) demonstrate compliance with the statute of limitations, which bars Lead Plaintiff's claims

---

[1] *See Open-End Fund Liquidity Risk Management Swing Pricing; Re-Opening of Comment Period for Investment Company Reporting Modernization Release*, Release No. 33-9922, IC-31835, 17 CFR 210, 270, 274 (Sept. 22, 2015) ("2015 SEC Liquidity Release"), excerpted at Ex. A.

because they were brought more than one year after Lead Plaintiff was on inquiry notice. Accordingly, the CAC should be dismissed with prejudice.

## BACKGROUND

The facts set forth below are based on the allegations of the CAC, accepted as true solely for purposes of this motion, and the documents referenced in the CAC.

### A.    The Parties

The Fund is one of a family of open-ended mutual funds offered by Third Avenue Trust (the "Trust"), which is organized as a Delaware Statutory Trust and registered as an investment company under the federal Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.* ("ICA"). Lead Plaintiff has been a shareholder in the Fund since August 2014.  CAC ¶ 10, Ex. B.  In addition to the Fund, the range of investment options offered by the Third Avenue family of funds included the Third Avenue Value Fund, Third Avenue Small Cap Value Fund, and the Third Avenue Real Estate Value Fund.  Ex. B, Third Avenue Trust, Form N-1A, Registration Statement, Mar. 1, 2013 (the "Prospectus") at 1.[2]

Third Avenue Management LLC ("TAM" or the "Adviser") is a registered investment adviser under the Investment Advisers Act of 1940, and is the investment adviser to the funds offered by the Trust.  CAC ¶ 13.  Affiliated Managers Group, Inc. ("AMG") is a holding company and is the indirect majority equity holder in the Adviser.  *Id.* ¶ 14.  M.J. Whitman LLC

---

[2]  A mutual fund's registration statement, filed with the SEC on Form N1-A, includes both a prospectus and a Statement of Additional Information ("SAI"), which is incorporated by reference into the prospectus.  *See* SAI, Mar. 1, 2013, Ex. C at back cover; *White v. Melton*, 757 F. Supp. 267, 269 (S.D.N.Y. 1991).  In deciding this motion, the Court may rely on the Fund's publicly-filed disclosure documents – including the Prospectus and SAI – and other documents referenced in the CAC, because they are incorporated into and integral to the pleading, and thus form the bases of Lead Plaintiff's claims.  *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).  Numerical page references herein preceded by "Ex." are to the pages of exhibits annexed to the accompanying Declaration of Amy D. Roy.

(the "Distributor") is the Adviser's affiliated broker-dealer and served as distributor for the Fund. *Id.* ¶ 15.

At the beginning of the Class Period, the Board of Trustees had eleven members. Two were affiliated with the Adviser: Martin J. Whitman, the Chairman of the Board, and David M. Barse, who served as the CEO of the Adviser. CAC ¶¶ 16, 17, 29. The other Board members were deemed disinterested (*i.e.*, unaffiliated with the Adviser) under the ICA: William E. Chapman, II, Lucinda Franks, Edward J. Kaier, Patrick Reinkemeyer, Eric P. Rakowski, Martin Shubik, and Charles C. Walden (the "Independent Trustees"). *Id.* ¶¶ 19-25, 29.[3] The remaining defendant, Vincent Dugan, was not a member of the Board of Trustees but was the Fund's Chief Financial Officer. *Id.* ¶ 18.

### B.        The Fund's Investment Objective

The Fund's stated investment objective at all times was to seek long-term total return, including by investing "a substantial amount of its assets in credit instruments rated below investment grade." Prospectus at 18. By its nature, and as stated in its Prospectus, the Fund could have "significant investments in distressed and defaulted securities and intends to focus on a relatively small number of issuers." *Id.*[4] The Fund was permitted to invest "without limitation in distressed securities or other debt that is in default or the issuers of which are in bankruptcy." *Id.* at 24. The Fund could also invest in companies with low market capitalization, and securities in emerging markets, *id.*, and could concentrate its investments in a small number of issuers or industries, *id.* at 25. This strategy was designed to maximize potential rewards "for long-term

---

[3]  Two additional named defendants, former independent trustees Jack W. Aber and Marvin Moser, CAC ¶¶ 26, 27, are deceased.

[4]  The March 2013 version of the Prospectus is cited here because it is the version that was in effect at the beginning of the Class Period. The Prospectus was updated annually; subsequent versions are materially identical with respect to risk disclosures. *See* CAC ¶ 39.

investors seeking alternatives to equity investments for long-term total return." *Id.* at 21.  In

sharp contrast, the other Third Avenue funds offered in the same prospectus sought to achieve

their investment objectives mainly by acquiring equity of "well-financed companies (meaning

companies with high quality assets and conservative levels of liabilities) . . . ."  Prospectus at 2,

6, 10.

> ### C.      The Fund's Disclosures of Its Investment Risks

The Fund's Prospectus, SAI,[5] and other public disclosures prominently advertised the

inherent risks of this investment strategy.[6]  The Prospectus made clear that the Fund "is not

appropriate for short-term investors or those primarily seeking current income or for those

investors who cannot withstand the risk of loss." *Id.* at 21.

In exhaustive detail, the Prospectus and SAI laid out the specific risks of many of the

investments that the Fund planned to pursue.  These risks included, among others:

- *High-Yield and Distressed Securities.*  The Prospectus explained that "[t]he Fund's investments in high-yield securities (commonly known as 'junk bonds') and distressed securities may expose the Fund to greater risks." *Id.* at 18.  The document further explained: "Issuers of high-yield securities are not as strong financially as issuers of securities with higher credit ratings, so the securities are usually considered speculative investments." *Id.*

---

[5] As with the Prospectus, *see supra* note 4, the March 2013 version of the SAI is cited here because it is the version that was in effect at the beginning of the Class Period.  Again, versions from subsequent years are materially identical with respect to risk disclosures, *but cf. infra* n.7.

[6] Indeed, Lead Plaintiff cites an article demonstrating that the Fund's investment strategy and its inherent risks were well known.  *See* CAC ¶ 81.  The article reports that "Graystone Consulting, Morgan Stanley's independent adviser to institutional and wealthy clients, originally recommended the fund in 2014 via a due diligence report that clearly highlighted the fund's liquidity risks."  Ex. D, Tim McLaughlin, Ross Kerber & Svea Herbst-Bayliss, *Hidden in Plain Sight: Big Risks at Failed Third Avenue Fund Were Clear to Some*, Reuters (Dec. 23, 2015).  Graystone again recommended the Fund in 2015, in part because "Third Avenue has a strong track record as an investment manager and has found historical success in illiquid instruments." *Id.* (internal quotation marks omitted).

6

- *Obligations of Stressed, Distressed, and Bankrupt Issuers.*  Investors were cautioned that "significant uncertainties" surround the repayment of these securities, and the Prospectus noted the risk that the Fund may lose "its entire investment" in these securities.  *Id.*

- *Small- and Mid-Cap Risk.*   The Prospectus warned that the Fund could invest in companies with lower or mid-level market capitalization.  These investments "tend to be more volatile . . . than securities of larger companies."  *Id.* at 19.

- *Depressed Industries.*  "The Fund[] frequently identif[ied] opportunities in industries that appear[ed] to be temporarily depressed."   The Prospectus made clear that these investments would be subject to steeper losses than investments in more established industries.  *Id.*

- *Non-diversification.*  The Prospectus warned investors that the Fund's non-diversification by design – or concentration of investments in a relatively smaller number of holdings – would make the Fund even "more susceptible" to each of the above-referenced risks.  *Id.* at 19, 25.

Among these warnings, the discussion of the risk of illiquidity was especially conspicuous.  The Prospectus warned that the types of securities in which the Fund would invest "may involve greater liquidity risk," meaning that "the Fund may not be able to sell these investments at the best prices or at the value the Fund places on them."  *Id.* at 19.

Indeed, the Fund made clear disclosures demonstrating that many of the Fund's securities would carry high liquidity risks.  The Fund planned to invest heavily in high-yield and distressed securities, Prospectus at 24, "which are securities rated below investment grade by some or all relevant independent rating agencies (Baa by Moody's . . . ; below BBB by Standard & Poor's . . . or Fitch Ratings . . . )[;] and unrated debt securities of similar credit quality," SAI at 5.  The SAI warned that "the secondary market for those bonds is generally less liquid than that for higher rated bonds."  *Id.* at 6.  The SAI further reinforced this point by explaining that some of the Fund's investments "carry a number of special risks in addition to the normal risks associated with equity and debt investments," and that the Fund's private investments are especially likely to be illiquid, making it "difficult or impossible to sell these investments under many conditions."  *Id.* at 10.

The SAI also addressed the specific liquidity risks intrinsic in many of the high-yield investments the Fund would pursue. It warned, for example, of the following liquidity risks:

- *Small companies.* The SAI disclosed that securities of smaller companies are usually less liquid than securities of larger companies. *Id*. at 3.

- *Senior Loans.* The Fund's investments could include the purchase of senior secured floating-rate loans, some of which – the SAI warned – "will be subject to significant contractual restrictions on resale and, therefore, will be illiquid." *Id.* at 7.

- *Assignments.* The SAI explained that the Fund could obtain through assignments the rights to short-term corporate obligations from third parties. *Id.* The Fund predicted and disclosed that the lack of an established secondary market for these assigned loans "may have an adverse impact on . . . the Fund['s] ability to dispose of particular Assignments when necessary to meet the Fund's liquidity needs." *Id.*

- *Trade Claims.* The Fund disclosed that trade claims – another type of investment that the Fund planned to purchase – are inherently "illiquid instruments." *Id.* at 8.

- *Foreign securities.* The SAI further explained that its foreign securities could be less liquid than their U.S. equivalents because of the lower volume of trading on foreign stock exchanges. *Id.* at 9.

Though the Fund made clear that it could not eliminate these liquidity risks, the SAI explained that the Fund would seek to mitigate the risks by imposing a limit on illiquid securities that would apply at the time of purchase of any new investment. Specifically, the Fund would refrain from making a purchase if as a result of the acquisition more than 15% of the Fund's net assets would be invested in illiquid securities. *Id.* at 9.[7] An "illiquid security" was defined as "any asset or investment of which a Fund cannot sell a normal trading unit within seven days at approximately the value at which a Fund has valued the asset or investment." *Id.* The SAI disclosed the possibility that because the 15% limit applies only at the time of purchase, the Fund's illiquid holdings could later exceed 15% as market conditions changed. *Id.* In those

---

[7] The 2013 and 2014 versions of the SAI stated: "None of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets . . . would be invested in securities that are illiquid." SAI, Mar. 1, 2013, Ex. C at 9; SAI, Feb. 28, 2014, Ex. E, at 12. The 2015 version contained slightly revised language: "*Under normal circumstances*, none of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets . . . would be invested in securities that are illiquid." SAI, Mar. 1, 2015, Ex. F at 12.

circumstances, the SAI explained, "the Adviser would work with the Board to determine the appropriate steps and timeframe for alleviating such excess." *Id.* at 21.  Moreover, the Fund disclosed that it was "not required to liquidate an existing position solely because a change in the market value of an investment, or a change in the value of the Fund's net or total assets" causes it to exceed a self-imposed investment limit that applied at the time of purchase. *Id.* at 20.  The SAI further disclosed that the calculation of liquidity for each security would require a "review of pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities." SAI at 10.  Beginning as of October 31, 2014, the Fund also disclosed its determinations regarding the level of illiquid holdings in the Fund semi-annually, as follows:

| Illiquid holdings disclosed as of: | Percentage of illiquid holdings: |
| --- | --- |
| October 31, 2014 | 14.25% |
| April 30, 2015 | 12.22% |
| October 31, 2015 | 13.40% [8] |

### D.    The Fund's Disclosures of Its Underlying Holdings

In addition to the many risk disclosures in the Fund's public filings, the Fund was also transparent as to the composition of its holdings.  The Fund disclosed its complete portfolio holdings on a quarterly basis.  The Fund's quarterly reports detailed its entire portfolio, including (i) each security by name and industry sector, (ii) the principal amount, coupon rate, and maturity date for that security, and (iii) the value ascribed to the security.  *See*, *e.g.*, Form N-Q ("Quarterly Report"), Sept. 23, 2015, Ex. J at 9-13; Form N-CSR ("Semi-Annual Report"), Dec. 30, 2014, Ex. I at 32-36. [9]  The reports identified the Fund's holdings in the very categories of instruments

---

[8]   Semi-Annual Report, Dec. 24, 2015, Ex. G at 79; Semi-Annual Report, June 26, 2015, Ex. H at 59; Semi-Annual Report, Dec. 30, 2014, Ex. I at 77.

[9]   For multiple examples of the Fund's full disclosure of its entire portfolio, as well as detailed disclosures for each position, in the Quarterly and Semi-Annual Reports, *see* Quarterly Report, Mar. 16, 2015, at 8-12; Quarterly Report, Sept. 15, 2014, at 10-15; Semi-Annual Report, Apr.

whose risks were specifically stated in the Fund's disclosures.  For example, the reports showed that the Fund had investments in foreign securities, *see, e.g.*, Semi-Annual Report, Dec. 30, 2014, Ex. I at 32-36 (identifying foreign securities and showing the country concentration of the portfolio overall); Quarterly Report, Sept. 23, 2015, Ex. J at 9-13 (same); in senior loans, *see, e.g.*, Quarterly Report, Mar. 12, 2014, Ex. K at 14 (showing a senior secured floating-rate investment in Platinum Energy Solutions, Inc.); and in trade claims, *see, e.g.*, Semi-Annual Report, June 19, 2014, Ex. L at 40 (showing investment in ordinary claims from Pescanova, S.A.); Quarterly Report, Sept. 15, 2014, Ex. M at 12 (same).

The Fund also disclosed how it estimated the fair value of the specific bonds in its portfolio.  As part of this disclosure, the Fund divided the securities into three "levels," referring to the levels assigned by the Financial Accounting Standards Board, which reflect the type and volume of information available to value the security.  *See, e.g.*, Quarterly Report, Sept. 23, 2015, Ex. J at 14-17.[10]  As the Fund explained, Level 1 securities can be valued according to quoted prices in active markets.  *See, e.g.*, Semi-Annual Report, June 19, 2014, Ex. L at 52. Level 2 securities do not have quoted prices, but can be valued according to observable inputs, such as price quotes from brokers, pricing services, or other third parties.  *See, e.g.*, *id.* at 52-53. Securities are categorized as Level 3 when the inputs are not observable and the Fund must

---

30, 2014, at 37-43; Quarterly Report, Mar. 12, 2014, at 14-20; Semi-Annual Report, Dec. 30, 2013, at 56-61; Quarterly Report, Sept. 18, 2013, at 15-21; Semi-Annual Report, June 25, 2013, at 38-42; Quarterly Report, Mar. 7, 2013, at 14-19; Semi-Annual Report, Jan. 2, 2013, at 59-63. All such reports are on file with the SEC, and exemplars are attached to the Roy Declaration, Exs. G, H, I, J, K, L, and M.

[10]  *See also* Quarterly Report, Mar. 16, 2015, at 13-18; Semi-Annual Report, Jan. 6, 2015, at 32-36; Quarterly Report, Sept. 15, 2014, at 18-24; Semi-Annual Report, Apr. 30, 2014, at 37-43; Quarterly Report, Mar. 12, 2014, at 22-27; Semi-Annual Report, Dec. 30, 2013, at 70-74; Quarterly Report, Sept. 18, 2013, at 23-27; Semi-Annual Report, June 25, 2013, at 52-57; Quarterly Report, Mar. 7, 2013, at 21-25; Semi-Annual Report, Jan. 2, 2013, at 71-72.  All such reports are on file with the SEC, and exemplars are attached to the Roy Declaration, Exs. G, H, I, J, K, L, and M.

therefore use its own judgment to determine the fair value.  *See, e.g.*, *id.*  Investors could therefore ascertain, based on these disclosures, how the Fund had valued its positions.

### E.    The Fund's Performance, Worsening Market Conditions, and Ultimate Liquidation

From the beginning of the Class Period, while pursuing its stated investment objectives, the Fund grew its assets from approximately $1 billion to $3.5 billion, CAC ¶ 4, delivering strong returns for investors.

Beginning in 2014, however, increasingly hostile market conditions and a general reduction in liquidity caused a downturn in the Fund's performance – resulting in an increase in investor redemptions.  *Id.* ¶ 94.  In late 2015, a seize-up in the distressed debt market, coupled with increased requests from Fund investors to redeem their shares, resulted in predatory bidding that prevented the Fund from selling assets at appropriate prices.  *Id.* ¶¶ 88, 94; Gregory Zuckerman & Matt Wirz, *How the Third Ave. Fund Melted Down*, Wall St. J. (Dec. 23, 2015) (describing investors' concern over junk bonds, which grew into a "junk-bond rout"), Ex. N.[11] Due to the confluence of these events, in late 2015 the Fund became unable to generate sufficient cash to meet these redemptions without resorting to sales at prices that the Adviser and the Board concluded would unfairly disadvantage the remaining shareholders.  *Id.* ¶¶ 84, 94; Third Avenue Management Letter to Shareholders (Dec. 10, 2015) ("Shareholder Letter"), Ex. O.[12]

Ultimately, on December 9, 2015, the Board determined to p lace the Fund's assets in a liquidating trust and initiate a plan of liquidation for the orderly sale of Fund assets and the distribution of proceeds to shareholders.  CAC ¶ 94; Shareholder Letter at 1.  The Fund then

---

[11]  This source is cited in the CAC, and the source is therefore properly before this Court in ruling on the motion to dismiss.  *See* CAC ¶ 82; *Int'l Audiotext*, 62 F.3d at 72.

[12]  The letter is available at http://focusedcreditfund.com/wp-content/uploads/2016/08/FCF-Shareholder-Letter-12-9-2015.pdf.

requested that the SEC allow the Fund to suspend redemptions, and on December 16, 2015, the SEC entered an order permitting the temporary suspension of the right of redemption for the protection of the Fund's security holders – and all assets were transferred from the liquidating trust back to the Fund.[13]   The order authorizing suspension of redemptions was effective as of December 10, 2015 – the date on which redemptions had been suspended. The Fund's redemption policy expressly contemplated that the right of redemption could be suspended under specified circumstances, including "when the SEC has by order permitted such suspension." SAI at 48.

## LEGAL STANDARD

### A.   Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) requires dismissal when the allegations of the complaint fail to provide "'plausible grounds' for the allegations with 'enough fact to raise a reasonable expectation that discovery will reveal evidence' to support them." *Coronel v. Quanta Capital Holdings, Ltd.*, No. 7 Civ. 1405, 2009 WL 174656, at *10 (S.D.N.Y. Jan. 26, 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Though well pleaded facts are taken as true, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

To establish that an issuer or underwriter of a registration statement is liable under Section 11 of the Securities Act, a plaintiff must demonstrate, *inter alia*, that the registration statement contained "(1) a material misrepresentation; or (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of

---

[13]   *See* Third Avenue Trust and Third Avenue Management LLC; Notice of Application and Temporary Order, SEC Release No. IC-31943/812-14593 (Dec. 16, 2015), www.sec.gov/rules/ic/2015/ic-31943.pdf, Ex. P.

information that is necessary to prevent existing disclosures from being misleading." *Hutchison v. Deutsche Bank Sec., Inc.*, 647 F.3d 479, 484 (2d Cir. 2011); 15 U.S.C. § 77k(a).  Section 12(a)(2) of the Act "imposes liability for selling or offering securities by using a prospectus 'which includes an untrue statement of a material fact or omits to state a material fact  necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.'"  *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005) (quoting 15 U.S.C. § 77l(a)(2)).

### B.    2015 SEC Liquidity Release

In connection with a proposed rule-making, the SEC issued an extensive release regarding liquidity risk management in mutual funds in 2015, which provides a comprehensive summary of the rules governing liquidity and the SEC's guidance under those rules.  *See* 2015 SEC Liquidity Release, excerpted at Ex. A.  As discussed below, the Liquidity Release provides express guidance relating directly to many aspects of Lead Plaintiff's claims, including the key fact that "the Commission has not promulgated rules requiring open-end funds to invest in a minimum level of liquid assets."  *Id.* at 34.

## ARGUMENT

## I.    THE CAC DOES NOT ALLEGE ANY ACTIONABLE FALSE STATEMENT OR OMISSION

None of the misrepresentations or omissions asserted in the CAC gives rise to liability on the part of any defendant.  Viewing the six alleged categories of misleading statements or omissions that follow Lead Plaintiff's general critique of the Fund's management, CAC ¶¶ 105-132, each fails to state a Securities Act claim as a matter of law, as the statements are either not actionable by their nature or simply not false when judged against the correct SEC rules and guidance.  In any event, as a matter of law none of the alleged statements or omissions could

have been materially misleading to a reasonable investor, as the "total mix" of information fully apprised investors of the nature of the Fund's investment style, its holdings, and the risks involved in owning Fund shares.

### A.    The Prospectuses Did Not Misrepresent the Liquidity of the Fund's Portfolio

Lead Plaintiff's central allegation is that the level of the Fund's illiquid investments was not "appropriate under the circumstances" as it exceeded 15% of the Fund's assets, in violation of the Fund's self-imposed 15% restriction on such holdings and parallel SEC guidance.  CAC ¶¶ 109, 56.  But the Fund's determinations and subsequent disclosures regarding its liquidity levels – and whether they were "appropriate" –  are not "facts" that can be adjudged as true or false under the securities laws, as they necessarily involve judgments, opinions and estimates. Such determinations are not actionable except in narrow circumstances not present here. Moreover, Lead Plaintiff's assertion that the Fund's 15% limitation on illiquid investments was exceeded is based on both a flawed measure of the Fund's illiquid holdings and a fundamental misreading of the limitation under clear SEC guidance.

### (i)    Determinations of Liquidity Levels and Alleged Statements Regarding "Appropriate" Liquidity Are Not Actionable Statements of Fact

The Fund's SAI sets forth the established definition of when a holding becomes "illiquid" – when "a Fund cannot sell a normal trading unit in the ordinary course of business within seven days at approximately the value at which a Fund has valued the asset or investment."  SAI at 12. As Lead Plaintiff acknowledges, this definition tracks the SEC's own definition.  CAC ¶ 49 (citing *Acquisition and Valuation of Certain Portfolio Instruments by Registered Investment Companies*, SEC Release No. IC-14983 (Mar. 21, 1986)); *accord* 2015 SEC Liquidity Release at 32 n.80.  Thus, to determine an asset's liquidity, the Fund must first determine its fair market value, and then evaluate the likelihood that it could be sold at that value within seven days.  SEC

14

guidance makes clear this determination is not a black-or-white exercise. "The Commission has not established a set of required factors that must be considered when assessing the liquidity" of portfolio holdings. 2015 SEC Liquidity Release at 37. Instead, the SEC has provided "examples of factors" that would be "reasonable . . . to take into account" when assessing liquidity.

> These factors include: the frequency of trades and quotations for the security; the number of dealers willing to purchase the security or sell the security and the number of other potential purchasers; dealer undertakings to make a market in the security; and the nature of the security and the nature of the marketplace in which it trades, including the time needed to dispose of the security, the method of soliciting offers, and the mechanics of transfer.

*Id.* The SAI similarly described to investors that a "review of pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities" would be undertaken "in determining whether to treat any such security as liquid" for purposes of the 15% limitation. SAI at 10.

Such determinations are plainly subjective expressions of judgment and opinion, not objective facts for purposes of the securities laws. *See, e.g.*, *RQSI Glob. Asset Allocation Master Fund Ltd. v. APERCU Int'l PR LLC*, 2016 WL 1452434 at *7 (W.D. Ky. April 13, 2016) (describing multiple approaches to measuring liquidity and finding that "[t]here is not a consensus measurement"). Therefore, the Fund's statements about liquidity levels must be analyzed under the Supreme Court's standard in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015). Under *Omnicare* and its progeny, an estimate, judgment, or opinion cannot be actionable as a misstatement of fact unless "the speaker did not hold the belief she professed[,] the supporting fact[s] she supplied were untrue[,] [or] . . . the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 135 S. Ct. at 1332). The CAC does not plausibly allege facts supporting these narrow exceptions. Rather, the

CAC merely posits that the determinations of the Fund's liquidity levels turned out to be incorrect, *see* CAC ¶¶ 108-09, an allegation which cannot give rise to liability under *Omnicare*, 135 S. Ct. at 1326-27, 1332.[14]

The same reasoning applies to Lead Plaintiff's repeated allegation that the Fund "did not maintain a level of portfolio liquidity that was appropriate under the circumstances." CAC ¶¶ 3, 51, 56, 109, 130. This allegation is based upon the SEC's guidance, as summarized in the 2015 SEC Liquidity Release: "The Commission also has stated that open-end funds have a 'general responsibility to maintain a level of portfolio liquidity that is appropriate under the circumstances.'" 2015 SEC Liquidity Release at 34 (quoting *Revisions of Guidelines to Form N-1A*, SEC Release No. 33-6927, 17 CFR 239, 274 (Mar. 12, 1992) (the "1992 Guidelines Release")). While Lead Plaintiff alleges that the Fund did not comply with this "general responsibility," the CAC does not point to any specific disclosure regarding "appropriate" liquidity that was allegedly false. Even reading into the Fund's registration statements an undertaking that the Fund will maintain "appropriate" liquidity – as Lead Plaintiff appears to propose – the allegations that the Fund failed to do so are not actionable as a matter of law under *Ominicare* and *Tongue*. Here again, such an inherently subjective statement about "appropriateness" involves an expression of judgment or opinion, rather than a statement of objective fact required under the securities laws. *See, e.g.*, *Ross v. Lloyds Banking Grp.*, No. 11-

---

[14]  In an attempt to bolster these allegations, the CAC criticizes the way the Fund actually managed its liquidity. The CAC alleges, for example, that "[t]he Fund did not maintain a level of portfolio liquidity that was appropriate under the circumstances," CAC ¶ 109; that "the Fund failed to monitor assets closely and make the appropriate adjustments to valuations as circumstances and conditions changed," *id.*; and that "either the Board did not monitor liquidity or did monitor liquidity and then failed to take appropriate measures to improve the liquidity of the Fund," *id.* ¶ 111. These allegations regarding management – though without merit – are wholly irrelevant to a disclosure-based Securities Act claim. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).

cv-8530, 2012 WL 4891759, at *6 (S.D.N.Y. Oct. 16, 2012) ("[T]he characterization that the . . . entity would have 'very strong liquidity' was an opinion . . . .").

In addition, judgments about whether an asset would likely sell within seven days or whether the Fund will exhibit "appropriate" liquidity to meet future redemptions are also not actionable because they are forward-looking, and thus subject to the protection of the "bespeaks caution" doctrine.   "'A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading.'"   *Singh v. Schikan*, 106 F. Supp. 3d 439, 451 n.9 (S.D.N.Y. 2015) (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010)).   Cautionary language is sufficient when it specifically addresses the risk at issue.   *Id.*   Here, as discussed, all the liquidity risks were prominently and thoroughly disclosed.   Thus, forward-looking statements regarding liquidity – of the type Lead Plaintiff seeks to read into the Fund's registration statements – are not actionable.

### (ii)     The CAC Misreads the 15% Limitation on Illiquid Holdings, Which Is to Be Applied at the Time of Purchase

Moreover, Lead Plaintiff's allegations regarding supposed violations of the Fund's stated 15% limitation on illiquid holdings are based on a misreading of the policy and related SEC guidance.   The Fund's self-imposed limitation incorporates the SEC's long-standing "15% guideline" to the same effect.   *See* 2015 SEC Liquidity Release at 35-36.   The Fund's policy is set forth in the SAI, which makes clear that the 15% limit is to be applied at the time of purchase – not to subsequent "passive" increases in illiquidity due to market movements.   The SAI could not be clearer on this point, stating that the Fund will not "*purchase or otherwise acquire* any investment if, *as a result*, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid." SAI at 9 (emphasis added)).   This policy is fully

consistent with the SEC's interpretation of the 15% guideline: "the 15% standard is a limit on the *acquisition* of illiquid assets, not a limit on the *holdings* of illiquid assets." 2015 SEC Liquidity Release at 36 n.92 (emphases added). Thus, a fund exceeds that limit only "if, *immediately after the acquisition*, the fund would have invested more than 15% of its net assets" in illiquid assets. *Id.* at 152. In focusing on the time of purchase, the SEC reaffirmed its existing guidance on liquidity limits and followed the approach Congress and the Commission have taken in analogous contexts.[15]

Lead Plaintiff asserts, by contrast, that the 15% illiquidity limitation does not apply only at the time of purchase, but in fact requires that the Fund's holdings in illiquid investments be *at all times* less than 15%. CAC ¶¶ 49, 106-109. In support of this proposition (which is plainly contrary to the terms of the SAI's language above), Lead Plaintiff relies on earlier 1992 SEC guidelines. CAC ¶¶ 49-51 (citing the 1992 Guidelines Release). But the 1992 Guidelines Release was expressly *repealed* by the SEC in 1998. *See* Registration Form Used by Open-End Management Investment Companies, 63 Fed. Reg. 13,916-01, 13,940 (Mar. 23, 1998) (noting that much of the existing guidance has become outdated, referring to the new Form N-1A, and noting that a Registration Guide will be produced to codify the relevant guidance). And in any

---

[15] The SEC explained that the time-of-purchase approach "is consistent with approaches that Congress and the Commission have historically taken in other parts of the Investment Company Act and the rules thereunder." 2015 SEC Liquidity Release at 36 n.92. The release provides several examples of analogous time-of-purchase tests applicable to mutual fund holdings. *See id.* at 144 n.348 (citing ICA § 5(c) (an investment company will not lose its diversified status if there is a discrepancy between its holdings and the diversification requirements, "so long as any such discrepancy existing immediately after its acquisition of any security or other property is neither wholly nor partly the result of such acquisition"); 17 C.F.R. § 270.2a-7(d)(3) (money market funds' portfolio diversification requirements are assessed "[i]mmediately after the acquisition of any security"); *id.* § 270.2a-7(d)(4) (money market funds cannot acquire securities if liquidity limits would be exceeded "immediately after the acquisition"); *see also Statement Regarding "Restricted Securities,"* Investment Company Act Release No. 5847, at 6 (Oct. 21, 1969) (recognizing that a 10% limit on restricted securities applied only at the time of purchase).

event, the definitive 2015 SEC Liquidity Release unequivocally sets forth the Commission's view that liquidity limitations are to be applied at the time of purchase – and the 1992 Guidelines Release is *not* to the contrary.  2015 SEC Liquidity Release at 36 n.92.

Once the 15% limitation is correctly understood as a time-of-purchase limitation, Lead Plaintiff's claim collapses.   Nowhere does the CAC allege that particular purchases of supposedly illiquid securities for the Fund's portfolio caused the Fund's level of illiquidity to exceed 15% *at the time of purchase*.  Rather, the CAC simply alleges that the Fund's level of illiquidity was greater than 15% at selected points in time, CAC ¶¶ 69-71,  without accounting for the fact that such levels (even if accurate) could well have resulted from "passive" movements (*e.g.*, increases in market illiquidity) causing holdings to *become* illiquid after the time of purchase.   Thus, the CAC fails to allege a plausible claim that the 15% limitation (correctly applied) was exceeded.

### (iii)    The CAC Overstates the Fund's Level of Illiquidity

Aside from misreading the 15% limitation – and even if liquidity determinations were treated as objective facts for these purposes – the CAC's purported calculations of the level of illiquid securities in the Fund are facially implausible, as they rely upon supposed measures that are not based on the applicable definition of illiquidity discussed above.

First, the CAC proffers an "analysis" of the Fund's liquidity on three dates – April 30, 2013, 2014 and 2015 – and concludes that the level of illiquid assets in the Fund on those days ranged between 18.0% and 48.7%.  CAC ¶¶ 68-72.  As described by Lead Plaintiff, the analysis is based upon a "proprietary historical bond trading database" that allegedly reflected "whether any units of those securities *were traded*" in the 7-day and 30-day periods before and after the three selected April 30 dates.  *Id.* (emphasis added).  Under Lead Plaintiff's methodology, any security in the Fund's portfolio that happened to have not been traded during the week or month

before or after the selected April 30 date (according to the "database") was treated as "illiquid" in the CAC's tally.  *Id.*  But according to the Fund's (and the SEC's) expressed definition of liquidity, liquidity turns on whether a security *could have traded* at the marked price had the Fund attempted to sell it, not whether holders of the security in fact elected to sell during some period picked by Lead Plaintiff.  Thus, the CAC's methodology (which appears to be Lead Plaintiff's invention) is *not* the standard that the Fund's disclosures defined, and by which the Fund's liquidity judgments and disclosures must be measured.  Lead Plaintiff cannot assert a misrepresentation claim by invoking a standard different from the one on which the Fund expressly based its representations.

Similarly, Lead Plaintiff's second proffered calculation of the level of liquidity in the Fund, CAC ¶¶ 73-78, also ignores the definition of illiquidity in the Fund's disclosures (and SEC guidance).  The CAC's purported "analysis" of the Fund's holdings treats whole categories of securities in the portfolio as being by definition illiquid – and then adds up the percentage of the portfolio that those categories constituted on the same three April dates.  *Id.* (treating all term loans, preferred stock, convertible preferred stock, and so-called "Level 3 Fair Valued Securities" as *per se* illiquid).  The purported justification for this categorical approach is that these types of securities are "typically" illiquid, and indeed in this case "were – in fact – illiquid."  *Id.* ¶¶ 73-74.  However, Lead Plaintiff offers nothing but its say-so to support this blanket assertion of *per se* illiquidity.  And in any event, Lead Plaintiff's methodology is again inconsistent with the Fund's (and the SEC's) disclosed liquidity test.  Indeed, the SEC expressly recognized in the 2015 SEC Liquidity Release that a categorical approach of this type is inappropriate, as liquidity analysis must be undertaken holding by holding, as the Fund did:

> We recognize that the specific factors appropriate for consideration could vary *depending on the issuer and the particular asset*, and therefore an evaluation of a

*particular portfolio position's* liquidity could focus more heavily on certain factors and less on others.

2015 SEC Liquidity Release at 81 (emphases added).   Accordingly, the CAC's categorical "analysis" of the Fund's illiquidity levels is pure *ipse dixit* and is not tied to the definition on which the Fund predicated its disclosures or the SEC's definition of liquidity.

### (iv)   The CAC Ignores the Disclosures of the Fund's Portfolio Holdings

Lead Plaintiff's database liquidity "analysis" fails as a matter of law on other grounds. Most significantly, even if the analysis yielded accurate information, Lead Plaintiff ignores that the Fund's disclosures – portfolio holdings and level lists contained in the Quarterly and Semi-Annual reports – contain the very information used by Lead Plaintiff in its analysis, thereby establishing that the Fund disclosed the relevant underlying facts.

Lead Plaintiff's liquidity analysis relies on the publicly disclosed holdings in the Fund. *See* CAC ¶¶ 69, 74.  Specifically, Lead Plaintiff concedes that it used the Fund's listed securities in its analysis, and that CUSIPs for the underlying securities were readily available.  *See id.* at ¶ 72 n.7 (although Lead Plaintiff claims to have conducted an "investigat[ion]," CUSIPs are accessible on the internet through common search engines).   Any investor could therefore do what Lead Plaintiff did: use the issuer names or CUSIP numbers to obtain the last trade price, last trade yield, and last trade date for each investment in the Fund's portfolio[16] – the very information upon which Lead Plaintiff bases its analysis.

---

[16] Lead Plaintiff simply used the Trade Reporting and Compliance Engine (the "TRACE" system).   CAC ¶ 69.   That system is available to the public on the website of the Financial Industry Regulatory Authority's ("FINRA").   *See* http://www.finra.org/industry/trace/corporate-bond-data.   Once within the database, a user can enter the issuer name (listed in the Fund's portfolio holdings) or the CUSIP and generate a list of bonds, including coupon and maturity date, to aid identification of the scrutinized security.   A link then allows the user to view the last trade price, last trade yield, and last trade date for any given investment.

When the allegedly undisclosed information is in fact available in the public forum, a defendant cannot be held liable for failing to disclose the information alleged to have been omitted.  *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("[A]t the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.") (collecting cases)); *cf. Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.").  Lead Plaintiff's allegations "cannot be established by the naked assertion of concealment of material facts, when these facts were . . . otherwise relayed to investors."  *Gissin v. Endres*, 739 F. Supp. 2d 488, 510 (S.D.N.Y. 2010) (granting motion to dismiss complaint for securities fraud).  Similarly, here, because the Fund regularly disclosed its entire holdings and the nature of those holdings – and those holdings could then be analyzed by investors (including in the public tool that Lead Plaintiff chose to employ) – Lead Plaintiff's claims fail as a matter of law.

### B.   The Prospectuses Did Not Misrepresent the Defendants' Ability to Value Securities Properly

Lead Plaintiff next asserts that the Fund's registration statements misrepresented the "Defendants' Ability to Properly Value Securities." CAC ¶¶ 122-24.  In particular, the CAC asserts that the Fund falsely described how its Net Asset Value ("NAV") is calculated, *id.* ¶ 122, and misrepresented that the Fund's portfolio holdings would be of "similar quality as other below investment grade bonds and credit instruments," *id.* ¶ 123.  According to Lead Plaintiffs, these Fund statements were rendered false because the Fund failed to take into account that many of the Fund's securities were illiquid when setting the NAV and comparing the Fund's securities to those in other funds.  *Id.* ¶ 124.

22

Like liquidity determinations, estimating a holding's fair market value (when a market price is not readily available) necessarily involves judgments and opinions.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011) (determinations of the fair value of assets "are not matters of objective fact"), *abrogated on other grounds by Omnicare*, 135 S. Ct. 1318; *In re Allied Capital Corp. Sec. Litig.*, No. 02-cv-3812, 2003 WL 1964184, at *1 (S.D.N.Y. Apr. 25, 2003) ("[V]aluing securities for which no current market exists involves the exercise of judgment, and is inherently imprecise.").  Here again, such estimates are not actionable under *Omnicare* absent plausible allegations that they express an opinion that the speaker did not actually hold, that the opinion relies upon misstated facts, or that the omission of information makes the statement misleading to a reasonable investor.  The CAC makes no such allegations.  The Fund fully disclosed its valuation methods and any potential shortcomings of those methods.  The disclosures discussed the Valuation Committee, which would be responsible for valuing each position in the Fund's portfolio, and the Fair Value Committee, which would oversee the fair valuation process.  SAI at 26.  The CAC does not allege that the Fund falsely described the valuation process or did not subjectively believe in the accuracy of the valuations.  Instead, the factual premise of the supposed misrepresentations regarding valuation is the same set of allegations discussed above – that the Fund understated its illiquid holdings.  Accordingly, these allegations fail to state a claim for the same reasons as the first category discussed above in Section I.A.

**C.** **The Prospectuses Did Not Misrepresent Shareholders' Ability to Redeem Their Shares**

In arguing that the Fund misrepresented shareholders' ability to redeem shares, *see* CAC ¶¶ 116-18, Lead Plaintiff again confuses a disappointing result with a violation of the Securities Act.  The Fund's disclosures made clear that the ability to redeem shares would not be absolute;

redemptions could be suspended in specified exceptional circumstances, including "when the SEC has by order permitted such suspension."  SAI at 48.  That is, of course, exactly what happened here: the SEC entered an order allowing the temporary suspension of redemptions during the orderly liquidation of the Fund's assets.  *See* Third Avenue Trust and Third Avenue Management LLC; Notice of Application and Temporary Order, SEC Release No. IC-31943/812-14593 (Dec. 16, 2015), www.sec.gov/rules/ic/2015/ic-31943.pdf, Ex. P.  The Fund explained to the SEC in its application the exceptional circumstances warranting the suspension, and the SEC promptly agreed and granted the suspension order, with retroactive effect to December 10, 2015 – the date as of which redemptions in the Fund were no longer relevant.  *Id.*

Though the suspension of redemptions may have been an unfavorable outcome, it was entirely consistent with the Fund's disclosures and therefore cannot form the basis of a misrepresentation claim.

### D.    The Prospectuses Did Not Misrepresent the Fund as a High-Yield Fund

Lead Plaintiff next asserts that it was a misrepresentation for the Fund to be marketed as a "high-yield" bond fund.  CAC ¶¶ 119-20.  However, the Fund does not utilize the expression "high-yield" in its name, nor does the CAC point to any instance of the Fund describing itself as a "high-yield fund."   Rather, the bases for this allegation appear to be that the Fund acknowledged investing in certain "high-yield" securities and used the Barclays Capital U.S. Corporate High-Yield Index as *one* of its performance benchmarks – the other being the Credit Suisse Leveraged Loan Index.  *Id.* ¶ 120.  As an initial matter, the CAC offers no explanation as to why investing in "high-yield" securities and using a "high-yield" index as one of two performance benchmarks for comparison purposes is the equivalent of the Fund "marketing" itself as a "high-yield" fund.  There is no plausible basis for this logical leap.

Even assuming for argument's sake that the Fund can be deemed to have marketed itself as a "high-yield" fund, use of such a descriptor does not constitute a misrepresentation – because the Fund met the requirements for a high-yield fund.  The SEC states that the "high yield" label may be assigned when 65% or more of a fund's assets are invested in securities receiving a rating below BBB from Standard & Poor's or a rating below Baa from Moody's – that is, below investment grade. Investment Company Institute, *Questions About Rule 35d-1*, SEC No-Action Letter, Dec. 4, 2001.  The Fund's disclosures show that it was designed to meet that standard.  The *cover* of the Prospectus states that the Fund "[m]ay invest unlimited assets in below investment grade credit instruments."  *See also* Prospectus at 18 (stating that the Fund "intends to invest a substantial amount of assets in credit instruments that are rated below investment grade by some or all relevant independent rating agencies, including . . . Moody's, [and] Standard and Poor's").  The CAC contains no allegations suggesting that the Fund did not adhere to that standard.

In any event, as set forth above, the Fund fully disclosed its actual holdings, allowing any investor to characterize those holdings as he or she saw fit.

### E.     There Were No Misrepresentations in the Certifications

Lead Plaintiff next claims that the alleged misrepresentations and omissions discussed above rendered inaccurate the Sarbanes-Oxley certifications in the Fund's registration statements attesting to the accuracy of the disclosures.  CAC ¶¶ 125-28.  The CAC also suggests that the certifications falsely state that sufficient controls existed over disclosures and financial reporting. *Id.* ¶ 126.  These allegations are derivative of those addressed above, and therefore fail as a matter of law for the very same reasons.

**F.**  **The Prospectuses Did Not Fail to Include Principal Risks of Investing in the Fund**

Finally, Lead Plaintiff asserts that the Fund did not comply with the SEC's requirement in Form N-1A that mutual fund prospectuses disclose "'the principal risks of investing in the Fund, including the risks to which the Fund's particular portfolio as a whole is expected to be subject and the circumstances reasonably likely to affect adversely the Fund's net asset value, yield, or total return.'"  CAC ¶ 129 (quoting SEC Form N-1A).  As detailed above, however, the Prospectus included a detailed description of precisely these types of risks in a section labeled "Principal Investment Risks," Prospectus at 2-3, and these descriptions were expanded upon at length in the "Investment Policies" section of the SAI, SAI at 2-19.  In support of the alleged violation of Form N-1A, Lead Plaintiff simply repeats the supposed misrepresentations and omissions discussed above, regarding understated illiquidity percentages, lack of "appropriate" liquidity, *etc*.  For the reasons discussed above, the "principal risks of investing in the Fund" were fully disclosed, and no reasonable investor could have been misled regarding the nature of the Fund's investment style and the risks of owning its shares.

The Securities Act does not require a scorched-earth approach to disclosing risk.  In claiming that the Fund omitted to mention certain risks, the CAC essentially faults the Fund for failing to divulge every possible negative scenario.  Lead Plaintiff asserts, for example, that the Fund should have disclosed:  the absence of active markets for more than 15% of the Fund's securities, making it difficult to sell those securities at market value; the likelihood that "an increase in redemptions would force the Fund to sell illiquid securities for considerably less than their reported values, adversely impacting the Fund's NAV, yield, and total return"; and the potential that the Fund would be forced to freeze redemptions if it experiences substantially more redemptions than purchases. CAC ¶ 130.  Courts regularly reject assertions that issuers must

disclose hypothetical outcomes of the type that the CAC demands, and require plaintiffs to show a substantial likelihood, not a mere possibility, that investors would have been misled by the information available. *See In re ProShares*, 728 F.3d at 102. Under this standard, funds "cannot be expected to predict and disclose all possible negative results across any market scenario." *Id.*

In light of the Fund's prominent and thorough disclosures, any reasonable investor would have perceived that the Fund represented an aggressive, higher-risk investment and that liquidity problems could result in investment losses. *See, e.g.*, Prospectus at 21 (warning that the Fund was not suitable for short-term investors or those who could not stand the risk of loss); SAI at 18-19 (describing the investment risks of several types of securities); *id.* at 7, 9, 14, 17, 18. Lead Plaintiff's claim of a violation of Form N-1A fails as a matter of law.

### G.   A Reasonable Investor Could Not Have Been Misled Because the Risks of Investing in the Fund Were Fully Disclosed

Even if Lead Plaintiff were able to establish that the Fund's registration statements had misstated or omitted isolated pieces of information of the type alleged in the CAC, that could not form the basis of a viable claim under the Securities Act because these alleged shortcomings would not mislead a reasonable investor. Courts do not assess alleged material misrepresentations in a vacuum, but consider whether "defendants' representations or omissions, considered *together and in context*, would affect the *total mix of information* and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (emphases added); *see also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (asking, in considering the materiality of an alleged omission, whether there was "a substantial likelihood that the disclosure of the omitted [material] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (internal quotation marks omitted)). At the motion to dismiss

stage, "the materiality hurdle remains a meaningful pleading obstacle, and [courts] will dismiss . . . where the alleged omission was so obviously unimportant to a reasonable investor that reasonable minds would agree on that omission's unimportance." *In re ProShares*, 728 F.3d at 102 (internal quotation marks omitted).

Risks warned of in public filings cannot be the basis for a securities action when they ultimately materialize because the "total mix of information" could leave no reasonable investor unaware of the risks associated with her investment. *Id.* In *ProShares*, the defendants disclosed their investment strategy for several mutual funds and warned investors that the strategy involved "investment techniques that may be considered aggressive, including the use of futures contracts, options on futures contracts, securities and indices, forward contracts, swap agreements, and similar instruments." *Id.* at 100. The fund documents warned that this speculative approach could lead to significant losses, especially in volatile market conditions. *Id.* at 101. When losses to those mutual funds occurred during the volatile 2008-09 market, investors sued under the Securities Act, arguing that the defendants had failed to disclose the magnitude and probability of potential losses. Much like Lead Plaintiff here, the ProShares fund investors urged the court to parse individual phrases in the disclosures and find that these phrases did not convey the gravity of the risks involved. The Court of Appeals rejected this invitation, explaining that these disclosures must be read "within the context of the prospectus as a whole." *Id.* at 103; *accord DeMaria*, 318 F.3d at 180. Taken together, the ProShares fund disclosures informed investors that the funds were an aggressive investment, with high potential rewards and high attendant risks – risks of the kind that eventually came to fruition. As a matter of law, the defendants thus could not be liable for information allegedly omitted or for the isolated statements the plaintiffs claimed were inaccurate. *In re ProShares*, 728 F.3d at 105-09. In short,

"when a registration statement warns of the exact risk that later materialized, a . . . claim will not lie as a matter of law."  *Id.* at 102 (internal citation omitted).

The same principle disposes of Lead Plaintiff's claims here.  The CAC provides an extended critique of the Fund's aggressive investment style, including after-the-fact critiques from competitors and industry commentators.   If the Fund had been managed more conservatively, Lead Plaintiff believes that the Fund would have been prepared to weather the liquidity crisis that arose when the market for high-yield securities bottomed out in 2014 and 2015; the Fund's assets would not have then declined in value; the Fund would not have struggled to meet redemptions without liquidating assets at deflated values; and, in turn, there would have been no need to suspend redemptions.

But the risks Lead Plaintiff now cites are risks the Fund prominently disclosed.  The Prospectus and SAI made clear that the Fund was an aggressive investment, with risks that rendered it unsuitable for short-term investors or those averse to losses.   Prospectus at 21.  Liquidity risks were a major focus of the disclosures.  The documents explained that most of the Fund's high-yield investment targets were either inherently illiquid or could become illiquid in unfavorable market conditions.  For example, some senior loans have contractual restrictions on sale that make the loans illiquid, SAI at 7; loans obtained through assignment are illiquid because they have no established secondary market, *id*.; swap options carry higher liquidity risks than the underlying securities, *id.* at 17; and so forth.  It is these very risks that overtook the Fund as the high yield market tightened in 2014 and 2015.  Reasonable investors were fully aware of the possibility that these liquidity constraints could arise and cause investment losses.

The "total mix" of information also included detailed disclosures of the Fund's underlying holdings.  Investors could look to the semi-annual and quarterly reports setting forth

each security, its principal amount, coupon rate, maturity date, and the value the Fund had assigned it.  *See, e.g.*, Quarterly Report, Sept. 23, 2015, at 9-13; Semi-Annual Report, Jan. 6, 2015, at 32-36; *see also supra* n.9.  Quarterly letters and monthly updates provided further information about the Fund's specific holdings, including the top ten holdings and the percentage of the Fund they constituted, the Fund's credit-rating make-up, and asset class and industry percentages.  Through this information, a reasonable investor would have seen that the Fund was indeed investing in the kinds of high-yield securities that the disclosures forecasted.

The CAC's heavy reliance on a report published in 2016 by BlackRock, Inc. – the sponsor of a competitor fund, *see* CAC ¶¶ 58-66 – does nothing to bolster Lead Plaintiff's claims.u[17]  The BlackRock Report suggests nothing more than that the Fund was designed and managed in a fashion that was riskier than the BlackRock fund and other funds in its peer universe, which is perfectly consistent with the Fund's own description and positioning.  *See* BlackRock Report at 3-5 (reporting that the Fund had a higher level of unrated holdings than two other high-yield funds, had more assets in securities with coupons of 10% or higher, held more Level 3 securities, and was significantly more concentrated).  Nowhere does the BlackRock Report suggest that the Fund's management approach was inconsistent with its stated objectives and risk disclosures.  To the contrary, the Report summarizes the Fund's risk disclosures and acknowledges that they bespeak a fund that is risker than its peers:  "This type of language is *not common among other high yield mutual funds* and reflects an investment strategy that seeks to be highly concentrated in a small number of distressed assets."  *Id.* at 2 (emphasis added).  To the extent the BlackRock Report is relevant at all, it supports the view that the Fund was designed

---

[17]  BlackRock, Inc., *High Yield Case Study: Post Closing of Third Avenue Focused Credit Fund* (Jan. 2016), Ex. Q at 2, *available at* https://www.sec.gov/comments/s7-16-15/s71615-86.pdf ("BlackRock Report").

and advertised as a higher-risk investment.  And notably, Blackrock's analysis is based on the Fund's publicly-disclosed holdings reports, which were available to investors at all times as well.

In sum, reasonable investors bought the Fund not because they were misled, but because they sought the potential of long-term gains – gains that they enjoyed from the Fund's inception, through much of the Class Period.  But with the potential for gains also came risks – risks amply described in the Fund's Prospectus, SAI, and other materials.  As a matter of law, no reasonable investor could be misled in the face of these disclosures, and the CAC should be dismissed on this basis alone.

## II.   PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE PLAINTIFFS' ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED MISSTATEMENTS OR OMISSIONS

Even if the CAC had alleged an actionable false statement or omission, dismissal is still warranted because on the face of the complaint there is no causal connection between any false statement or omission and Lead Plaintiff's alleged losses.   Lack of loss causation is an affirmative defense to claims under Sections 11 and 12(a)(2).   15 U.S.C. §§ 77k(e), 77*l*(b).  When as here the lack of loss causation appears on the face of the complaint, the Court should dismiss the plaintiff's claims.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.").

Loss causation exists only if the alleged misstatements or omissions "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).   The misstatements or

omissions themselves – as distinct from "changed economic circumstances" or some other "tangle of factors" – must have caused the loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005); *accord Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) ("[P]rivate securities fraud actions are available[] not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." (internal quotation marks omitted)).

Given the distinct way in which mutual fund share prices are determined, it is apparent from the face of the CAC that no misstatement or omission alleged by Lead Plaintiff *could* have caused the Fund's value to decline. The price of a mutual fund share is not determined by the trading of the fund's shares on the open market. Rather, the price is a function of the fund's NAV, which is calculated based on a "statutorily defined formula" that relies upon the value of a fund's underlying securities, less its liabilities. *VanCook v. SEC*, 653 F.3d 130, 133 n.1 (2d Cir. 2011); *see also* 15 U.S.C. § 80a-2(a)(41); 17 C.F.R. §§ 270.2a-4, 270.22c-1. In other words, a fund's NAV decreases *only* when the values of the underlying securities in its portfolio decrease. The CAC acknowledges as much. CAC ¶ 45 ("Shares of open-end mutual funds are bought and sold at the NAV of the fund, which is based on the fund's underlying assets and is calculated at the end of each trading day.").

Accordingly, because mutual fund shares derive their price exclusively from the value of the underlying securities, any misstatements or omissions about the Fund itself can have no effect on the NAV – and thus could not have caused Lead Plaintiff's purported losses. *See Yu v. State St. Corp.*, 774 F. Supp. 2d 584, 590-91 (S.D.N.Y. 2011); *Clark v. Nevis Capital Mgmt., LLC*, No. 04-cv-2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) ("The price for [shares in a mutual fund] is unaffected by alleged misrepresentations and omissions concerning the fund

itself . . . ."). In *Yu*, shareholders in a State Street bond fund asserted Securities Act claims very analogous to those here – that the fund's disclosures understated the fund's exposure to risky mortgage-backed securities, over-stated the value of those securities in calculating the fund's NAV, and failed to disclose the extent of the fund's liquidity risk. *Yu*, F. Supp. 2d at 585-87. Judge Holwell dismissed those claims on causation grounds, because any losses necessarily "were due to the decline in the value of the Fund's underlying investments." *Id.* at 590-91 (internal quotation marks omitted). Similarly here, with or without any misrepresentations or omissions regarding the Fund's liquidity, the Fund would have suffered the same losses as a result of market forces. *Id.*; *see also Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998) ("[T]he share price of a mutual fund is not affected by alleged misrepresentations or omissions . . . [but instead] by the value of all the underlying securities it holds at a given time, and the fund price fluctuates with the price of those underlying securities."); *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004) (same). Accordingly, the revelation of any alleged misstatement could not have caused the alleged losses here, and because the absence of loss causation is apparent on the face of the CAC, Lead Plaintiff's claims should be dismissed.

## III. LEAD PLAINTIFF'S CLAIMS ARE BARRED BY THE ONE-YEAR NOTICE STATUTE OF LIMITATIONS

Lead Plaintiff's claims should be dismissed as well because they were brought outside the one-year statute of limitations under Section 13 of the Securities Act. *See* Securities Act § 13, 33 U.S.C. § 77m ("No action shall be maintained to enforce liability created under [the Securities Act] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ."). The Fund's disclosures, dating back more than a year before the commencement of this

action, are replete with the very information utilized in the CAC to calculate Lead Plaintiff's competing liquidity ratios and other information upon which Lead Plaintiff bases its claim. Lead Plaintiff had that data throughout the putative class period. Had it reviewed the public filings, a "reasonable investor conducting . . . a timely investigation would have uncovered the facts" constituting the alleged misrepresentations and omissions concerning liquidity and risk. *Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc*., 637 F.3d 169, 174 (2d Cir. 2011).

Lead Plaintiff was thus on inquiry notice throughout the putative class period and is barred by the one-year statute of limitations. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 412 (2d Cir. 2008) (holding that whether plaintiff was on inquiry notice may be a matter of law for the Court to decide). Because the underlying facts concerning risk, liquidity, and the portfolios' holdings were all publicly disclosed years prior to the commencement of this action, Lead Plaintiff's claims are time barred. *See In re Magnum Hunter Resources Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 300-301 (S.D.N.Y. 2014) (dismissing Securities Act claims as time barred pursuant to the inquiry notice rule in light of statements in public filings).

## IV. COUNT II FAILS AS TO THE INDIVIDUAL DEFENDANTS AND TAM, AS THEY ARE NOT SELLERS OF THE FUND'S SECURITIES FOR PURPOSES OF SECTION 12(a)(2)

The Section 12(a)(2) claims against the Individual Defendants and TAM should be dismissed because Lead Plaintiff has come nowhere close to establishing that those defendants are "statutory sellers" as required under that section. 15 U.S.C. § 77*l*(a) (only a person who "offers or sells a security" can be subject to liability under Section 12); *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988) (holding that the "statutory seller" requirement means that liability under Section 12(a) may be imposed "on only the buyer's immediate seller").

To qualify as a statutory seller, a defendant must have either (1) "'passed title, or other interest in the security, to the buyer for value,'" or (2) "'successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner.'"  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (quoting *Pinter*, 486 U.S. at 642, 647).  Because the CAC does not assert that the Individual Defendants or TAM directly sold securities, Plaintiff's Section 12(a)(2) claim is entirely dependent upon establishing the solicitation element.

The CAC's allegations are insufficient as a matter of law to demonstrate that the Individual Defendants or TAM solicited the purchase of any security.  Courts have emphasized that an allegation of "'direct and active participation'" is "'crucial'" to sustain a claim based on solicitation.  *F.W. Webb Co. v. State St. Bank & Tr. Co.*, No. 09-cv-1241, 2010 WL 3219284, at *16 (S.D.N.Y. 2010) (quoting *In re Westinghouse*, 90 F.3d 696, 717 n.19 (3d Cir. 1996)).  The defendant must have "directly or personally solicit[ed] the buyer" rather than acting through a broker or other third party.  *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 577 (S.D.N.Y. 1996).  "[T]he defendant must have directly 'urged' or sought to 'persuade' the buyer to purchase the securities."  *F.W. Webb*, 2010 WL 3219284, at *16 (quoting *Pinter*, 486 U.S. at 644, 647); *see also id.* ("'A person's remote involvement in a sales transaction or his mere participation in soliciting the purchase does not subject him to Section 12 liability." (quoting *Shaw*, 82 F.3d at 1215 (alterations omitted))).

Rather than demonstrating any kind of direct or active involvement, the CAC declares in conclusory fashion that "[t]he Section 12 Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Fund," CAC ¶ 143, and that the Individual Defendants "participat[ed] in the preparation of the false and misleading Registration Statements and

participat[ed] in marketing the shares of the Fund to investors, *id.* ¶ 144.  The CAC lacks any factual support for Lead Plaintiff's generic allegations.  Indeed, with respect to the Individual Defendants, Lead Plaintiff alleges only that the Individual Defendants *signed* various Registration Statements and Prospectuses at issue.  *Id.* ¶ 28.  And Lead Plaintiff says nothing about its basis for concluding that TAM is a statutory seller.  Such scant allegations fail as a matter of law under Section 12.  This Court has recognized that "[e]very Court of Appeals to have considered the issue . . . has held that an individual's signing a registration statement does not itself suffice as a solicitation under Section 12(a)(2)."  *Citiline Holdings, Inc., v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw*, 82 F.3d at 1216 (1st Cir. 1996); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989)).  The Court has therefore dismissed Section 12(a)(2) claims predicated merely on defendants' signing registration statements.  *Id.*  Importantly, the Court has observed that Section 12 does not mimic Section 11's model of attaching liability to every signer of the registration statement.  Imposing Section 12 liability on signers "would render this distinction a nullity," and would override the intent of Congress for a person not to be liable under Section 12 "'for mere participation in unlawful sales transactions.'"  *Id.* (quoting *Pinter*, 486 U.S. at 650); *see also City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 720 (S.D.N.Y. 2013) (dismissing Section 12(a)(2) claim because the allegation that defendants signed the registration statements amounted to "mere participation").  This Court should dismiss Count II against the Individual Defendants and TAM for the same reasons.

Moreover, the CAC does not plead any specific facts suggesting that the alleged solicitation was "motivated at least in part by [the defendant's] desire to serve his own financial interests or those of the securities' owner,'" as required.  *Pinter*, 486 U.S. at 647 ("[L]iability

extends only to the person who . . . [is] motivated at least in part by a desire to serve his own financial interests or those of the securities owner.").  Instead, the CAC simply recites the legal conclusion that the "Section 12 Defendants . . . were motivated by a desire to serve their own financial interests or those of the Fund or TAM."  CAC ¶ 143.  The CAC contains no other facts that would support a conclusion that the Individual Defendants or TAM had pecuniary motivations for any solicitation of securities.

The Section 12 claims against TAM and the Individual Defendants should therefore be dismissed.

## V.    THE CAC FAILS TO PLEAD A CLAIM OF CONTROL-PERSON LIABILITY AGAINST TAM, AMG, AND THE INDIVIDUAL DEFENDANTS

The CAC fails to satisfy either of the two independent requirements to make out a claim for control-person liability under Section 15(a) of the Securities Act, 15 U.S.C § 77o: "(1) a primary violation of the Securities Act" by the allegedly controlled person, and "(2) 'control' by the defendant."  *Singh*, 106 F. Supp. 3d at 447.  Lead Plaintiff fails on the first element requiring a "primary violation," because, as demonstrated above at pages 13-33, the CAC does not sufficiently allege that the Fund or any other defendant violated Section 11 or Section 12(a)(2).

Even if the CAC properly had alleged a primary violation, there would be no basis for control person liability because Lead Plaintiff's allegations do not demonstrate that TAM, AMG, or any of the Individual Defendants "controlled" the Fund.  To demonstrate control, a plaintiff must establish that "the defendant possessed the power to direct or cause the direction of the management and policies" of the primary violator, which must include "actual control over the transaction in question."  *Emps. Ret. Sys. of the Gov. of the V.I. v. JP Morgan Chase & Co.*, 804 F. Supp. 2d 141, 158 (S.D.N.Y. 2011) (internal quotation marks omitted).  A defendant can be liable only if it actually exercises its power, as distinct from merely having potential power.  *Id.*;

*see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (dismissing Section 15(a) claims because the plaintiff made only a "formulaic recitation" of the alleged control persons' roles rather than making specific allegations of actual control).   Moreover, a defendant must have the power to "*direct* or cause the direction" of actions, *Merrill Lynch*, 714 F. Supp. 2d at 485; it is not sufficient that the defendant could influence or persuade, *In re Lehman Bros. Sec. & ERISA Litig.*, 681 F. Supp. 2d 495, 500 (S.D.N.Y. 2010).   Likewise, it is not sufficient that the defendant had some power at a general level, or that it had power over unrelated activities.   Liability exists only if the defendant directs the action that gives rise to the primary violation.   *JP Morgan*, 804 F. Supp. 2d at 158 (a plaintiff must allege "that the defendant had actual control over the transaction in question"); *In re Global Crossing, Ltd. Sec. Litig.*, 02-cv-910, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 5, 2005) (same); *see also Lewy v. SkyPeople Fruit Juice, Inc.*, 11-cv-2700, 2012 WL 3957916, at *11-12 (S.D.N.Y. Sept. 10, 2012) (considering whether the defendants had control "over [the company's] publication of allegedly false statements").

Lead Plaintiff's sparse allegations fall far short of these standards.   Indeed, the CAC merely asserts that:

- "Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a director, Trustee and/or senior officer of [the] Fund or other Defendant companies," CAC ¶ 150;

- "TAM managed and controlled the business affairs of Third Avenue and was a control person of the Fund," *id.* ¶ 151;

- "AMG was a control person of the Fund by virtue of its ownership of TAM and as the parent company of TAM had the ability to exercise control of the Fund," *id.*; and

- The Individual Defendants, TAM, AMG, and their directors and officers "each had a series of direct and/or indirect business and/or personal relationships with other Trustees, directors and/or officers of the Fund," *id.* ¶¶ 150-51.

These conclusory statements do not come close to meeting the pleading standard for control person liability and warrant dismissal as a matter of law. *See, e.g.*, *Shaar Fund*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 578 (S.D.N.Y. 2012) ("Plaintiff's conclusory allegations that these Director Defendants exercised control . . . , without more, is insufficient."). The CAC merely relies upon the respective Defendants' titles or positions to assert the existence of control and provides no details of the relationships between the alleged control persons and the alleged primary violators. Nor does Lead Plaintiff allege that any supposed control extended to the specific challenged statements or omissions. And nowhere does the CAC allege any facts that the defendants actually *exercised* their supposed power to cause the alleged violation. Absent any link between the alleged control and the alleged primary violations, there can be no control-person liability. *In re Global Crossing*, 2005 WL 1907005, at *12 (requiring "actual control over the transaction in question").

At most, the CAC asserts only that the defendants held a certain *status* in relation to the Fund: that the Individual Defendants were directors, Trustees, or officers of the Fund or other entities, CAC ¶ 150; that AMG was TAM's majority equity holder, *id.* ¶ 151; and that TAM was the Fund's adviser and managed the Fund's "business affairs," *id.* Allegations of status alone are insufficient to establish control. In particular, a parent company is not necessarily a control person in relation to its subsidiary. *See In re WorldCom, Inc. Sec. Litig.*, No. 02-Civ-3288, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) (noting the absence of "case[s] or authority in support of the proposition that a parent/subsidiary relationship is a sufficient basis from which to infer control"). Similarly, the "[s]tatus of defendants as directors, standing alone, is insufficient to establish their control." *Penn. Ave. Funds v. Inyx, Inc.*, No. 08-cv-6857, 2011 WL 1795931, at

39

*2 (S.D.N.Y. May 5, 2011) (internal quotation marks omitted)).  Officer status likewise is not enough.  *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) ("Officer or director status alone does not constitute control.").  Permitting allegations of mere status to satisfy the control requirement would sweep aside the requirement that the defendant exercise *actual* control.  Because the CAC's threadbare control allegations state nothing more than, at most, each defendant's general status, Lead Plaintiff's Section 15(a) claim should be dismissed.

## CONCLUSION

The CAC should be dismissed in its entirety with prejudice.

Dated: New York, New York
       September 30, 2016

/s/ Robert A. Skinner

Robert A. Skinner
Amy D. Roy
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7560

Lee S. Gayer
1211 Avenue of the Americas
New York, NY 10036
(212) 841-0626

*Attorneys for Defendants Third Avenue Trust, William E. Chapman, II, Lucinda Franks, Edward J. Kaier, Eric P. Rakowski, Martin Shubik, Charles C. Walden, and Patrick Reinkemeyer*

/s/ John P. Coffey

John P. Coffey
Jonathan M. Wagner
Samantha V. Ettari
KRAMER LEVIN NAFTALIS & FRANKEL LLP

40

1177 Avenue of the Americas,
New York, NY 10036
(212) 715-9393

*Attorneys for Defendants M.J. Whitman LLC,
Third Avenue Management, Inc., Vincent A.
Dugan, and Affiliated Managers Group, Inc.*

/s/ Arnold S. Jacobs

Arnold S. Jacobs
Sigal P. Mandelker
Alexandra K. Skellet
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000

Michael Allen Firestein
2049 Century Park East, 32nd Floor
Los Angeles, CA  90067-3206
(310) 557-2900

*Attorneys for Defendant Martin J. Whitman*

/s/ Scott A. Edelman

Scott A. Edelman
Robert C. Hora
Rachel P. Fissell
MILBANK, TWEED, HADLEY & MCCOY LLP
28 Liberty Street
New York, NY 10005-1413
(212) 530-5000

*Attorneys for Defendant David M. Barse*

41